UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL McCUE, as | ) | |
| Personal Representative of | ) | |
| the Estate of Phillip McCue, | ) | Civil Action |
| Deceased, | ) | Case No. 1:14-cv-00098-GZS |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| CITY OF BANGOR, MAINE, | ) | |
| et al., | ) | |
| | ) | |
| Defendants | ) | |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants the City of Bangor, Maine, Officer Kimberly Donnell, Officer Wade Betters, Officer Joshua Kuhn, Officer David Farrar, and Officer Christopher Blanchard (hereinafter collectively the "Bangor Defendants"), by and through their attorneys Richardson, Whitman, Large & Badger, PC, and hereby submit the following Statement of Material Facts in support of their Joint Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c)(1) and D. Me. Local R. 56(b):

1.  Defendants Wade Betters, Chris Blanchard, Kimberly Donnell, David Farrar, and Joshua Kuhn have been police officers with the Bangor Police Department (hereinafter "BPD") at all times relevant to this case.  Plaintiff's First Amended Complaint (attached hereto as Exhibit 1) at ¶¶ 5-9.

2.  Officers Betters, Donnell, Farrar, and Kuhn each graduated from the Maine Criminal Justice Academy (hereinafter "MCJA") and Officer Blanchard graduated from the criminal justice academy in Vermont.  Transcript of Wade Betters' Deposition (attached hereto as

1

Exhibit 2) at Page 8, Line 24 – Page 9, Line 9;[1] Transcript of Chris Blanchard's Deposition (attached hereto as Exhibit 3) at Page 10, Lines 14-18; Transcript of Kimberly Donnell's Deposition (attached hereto as Exhibit 4) at Page 22, Line 21 – Page 23, Line 3; Transcript of David Farrar's Deposition (attached hereto as Exhibit 5) at Page 25, Line 25 – Page 26, Line 13; Transcript of Joshua Kuhn's Deposition (attached hereto as Exhibit 6) at Page 10, Line 23 – Page 11, Line 3.

3.      On September 12, 2012, Phillip McCue (hereinafter "McCue") was present at an apartment building located at 18 First Street in Bangor, Maine.  Plaintiff's First Amended Complaint at ¶ 13; Transcript of Bruce Oakes' Deposition (attached hereto as Exhibit 7) at Page 6, Line 24 – Page 7, Line 21 (McCue lived at 18 First Street and was there on September 12, 2012); Donnell Dep. at P. 26, Lines 2-7 (McCue was involved in an event at 18 First Street on September 12, 2012).

4.      That night while he was at 18 First Street, McCue began ranting and raving, hollering, swearing, pacing back and forth, stomping his feet, yelling, and screaming.  Oakes Dep. at P. 11, L. 16-21 (McCue was ranting and raving, swearing, pacing, and stomping his feet) Transcript of Jeffrey Mishou's Deposition (attached hereto as Exhibit 8) at Page 9, Lines 4-8 (McCue was yelling); id. at P. 10, L. 11-16 (McCue was screaming); Transcript of Charles Cromwell's Deposition (attached hereto as Exhibit 9) at Page 9, Lines 15-23 (McCue's screaming was during the night of September 12, 2012).

5.      At least some of McCue's conduct occurred in the hallway and/or common area of 18 First Street.  Mishou Dep. at P. 7, L. 12-18 (McCue was in the hallway making a racket); id. at P. 11, L. 1-9 (describing the location where McCue was as a common area and hallway).

---

[1]     Initial references to a deposition transcript shall be cited as follows: "Transcript of [Deponent's name] Deposition at Page _____, Line _____."  Subsequent references to the same deposition shall be cited as: "[Deponent's last name] Dep. at P. _____, L. _____."

2

6.      McCue was being so loud that other residents of the building could hear McCue's antics and odd behavior while they were in their own rooms.  <u>Mishou Dep.</u> at P. 7, L. 12-18 (Mishou was in his room and heard "a lot of commotion" and "a bunch of racket" coming from the hallway); <u>Oakes Dep.</u> at P. 11, L. 8-15 (Oakes was in his room and heard McCue hollering at the top of his lungs, which was loud); <u>Cromwell Dep.</u> at P. 9, L. 15 – P. 10, L. 7 (Cromwell heard McCue screaming the words "recompense" and "renewal" at the top of his lungs, which scared Cromwell and caused him to lock his door).

7.      At least one resident was so scared by McCue's loud and bizarre behavior that he locked his door. <u>Cromwell Dep.</u> at P. 9, L. 15 – P. 10, L. 7.

8.      McCue started kicking on one resident's door while yelling and asking for "another hit" of some substance.  <u>Mishou Dep.</u> at P. 7, L. 19-23 (McCue was kicking somebody's door); <u>id</u>. at P. 8, L. 24 – P. 9, L. 11 (McCue was kicking someone's door yelling and asking for a "another hit").

9.      In response to McCue's request for drugs, a resident of the building gave McCue bath salts.  <u>Cromwell Dep.</u> at P. 14, L. 13-18.

10.     At some point that night, a resident of the building named Bruce Oakes told the building manager, Milton Reed, that there was a situation unfolding on the third floor of the building with McCue.  <u>Oakes Dep.</u> at P. 7, L. 18 – P. 8, L. 7 (Oakes told Reed that there was something going on with McCue on the third floor); <u>id</u>. at P. 12, L. 19-22 (Oakes told Reed about McCue's ranting, raving, and continuous pacing back and forth).

11.     Milton Reed went to the third floor to investigate, but McCue's ranting and raving continued. <u>Oakes Dep.</u> at P. 8, L. 14-17 (Reed went to handle the situation but ranting and raving continued); <u>id</u>. at P. 13, L. 1-3 (Reed went upstairs to investigate).

12.     Bruce Oakes called the Bangor Police Department (hereinafter "BPD") about the situation with McCue because he feared Milton Reed was in danger.  Oakes Dep. at P. 8, L. 18-24 (Oakes called BPD because he felt Reed was in danger); id. at P. 13, L. 4-13 (Oakes was concerned and worried for Reed's safety).

13.     Bruce Oakes told the BPD that there was a very bizarre situation that he felt needed to be investigated involving an individual ranting and raving very loudly and pacing back and forth, and he did not know if drugs or alcohol were involved.  Oakes Dep. at P. 8, L. 18-24; (Oakes told the BPD there was a very bizarre situation happening on the third floor of the building) id. at P. 14, L. 14-19 (Oakes told the BPD someone was ranting and raving very loudly, pacing, he did not know if drugs and alcohol were involved, and he felt it needed to be investigated).

14.     Officer Kimberly Donnell received a call from the BPD dispatch advising her to respond to a call at 18 First Street relating to an individual yelling upstairs at that location.  Donnell Dep. at P. 26, L. 2-23.

15.     When Officer Donnell arrived at 18 First Street, Bruce Oakes let her into the building and told her about McCue's strange behavior and that it had been going on for about half an hour.  Oakes Dep. at P. 14, L. 15-11 (Oakes let the officer in and told her what was going on); Donnell Dep. at P. 27, L. 8-20 (Officer Donnell was informed someone had been yelling for about 30 minutes).

16.     At that time, Officer Donnell was on the first floor of the building and could hear yelling coming from upstairs.  Donnell Dep. at P. 27, L. 21 – P. 28, L. 2.

17.     Officer Donnell and Bruce Oakes proceeded upstairs to the second floor of the building after hearing a loud thrashing or crashing noise from somewhere upstairs.  Donnell Dep. at P.

28, L. 5-7 (Officer Donnell proceeded upstairs after hearing loud voices and thrashing from upstairs); Oakes Dep. at P. 9, L. 20-25 (they went upstairs after hearing a tremendous crash).

18.     Officer Donnell did not see anybody when she got to the second floor of the building, but she heard more loud noises and a bang.  Donnell Dep. at P. 28, L. 17 – P. 29, L. 2.

19.     Right around the same time Officer Donnell got to the second floor, McCue screamed something and then jumped over a banister in the third floor hallway and landed approximately eight feet below onto the stairway that led to the second floor. Mishou Dep. at P. 11, L. 1-9; id. at P. 12, L. 10-25.

20.     After McCue landed on the stairway, he put either his shoulder or elbow through the stairway wall causing a hole that was a little larger than a softball.  Mishou Dep. at P. 12, L. 10-25 (McCue put his elbow or shoulder through the wall); id.  at P. 13, L. 2-11 (describing size of hole).

21.     McCue then threw a beer bottle in the direction of Officer Donnell, screamed "fuck you" and ran past her.  Donnell Dep. at P. 29, L. 24 – P. 30, L. 13 (McCue screamed "fuck you" to Officer Donnell, threw a beer bottle and ran past her); Oakes Dep. at P. 10, L. 1-10 (McCue threw a beer bottle at Officer Donnell and ran by her).

22.     A resident of the building then informed Officer Donnell that McCue had just run out of the back of the building.  Donnell Dep. at P. 30, L. 14-22.

23.     Officer Donnell got on her radio and requested backup at 18 First Street for help with McCue.  Donnell Dep. at P. 33, L. 8-13; Betters Dep. at P. 38, L. 22 – P. 39, L. 6.

24.     Officer Donnell then exited the building to search for McCue.  Donnell Dep. at P. 30, L. 14 – P. 31, L. 1.

25.     After a few moments, Officer Donnell saw McCue walking in Davenport Park.  Donnell

<u>Dep.</u> at P. 31, L. 19-25.

26.     Officer Wade Betters responded to the call and found Officer Donnell in the area of First

Street and Cedar Street, at which point Officer Donnell got into Officer Betters' vehicle.

<u>Donnell Dep.</u> at P. 33, L. 1-7; <u>Betters Dep.</u> at P. 41, L. 22 – P. 42, L. 8.

27.     Officer Donnell informed Officer Betters of what had occurred at 18 First Street and that

she was trying to catch up with or monitor McCue.  <u>Betters Dep.</u> at P. 42, L. 7-20.

28.     Officers Betters and Donnell made contact with McCue near the Central Fire Station on

Main Street in an attempt to talk to him about what had occurred at 18 First Street.  <u>Betters</u>

<u>Dep.</u> at P. 43, L. 18 – P. 44, L. 19.

29.      McCue had been running before the officers met up with him, and when contact was

made he began pacing.  <u>Betters Dep.</u> at P. 45, L. 14-20.

30.     McCue was still yelling at this point, so the officers gave him a disorderly conduct

warning and also a warning to stay out of the roadway.  <u>Donnell Dep.</u> at P. 35, L. 11-15.

31.     McCue then either said something in gibberish to the officers and took off running, or

said "fuck you" to the officers and walked away.  <u>Betters Dep.</u> at P. 44, L. 15-19 (McCue

said something in gibberish and took off running); <u>Donnell Dep.</u> at P. 39, L. 6-11 (McCue

said "fuck you" and kept walking).

32.     Officer Betters observed at that time that McCue appeared intoxicated and in no mood to

communicate or talk to the police.  <u>Betters Dep.</u> at P. 46, L. 12-15.

33.     Officers Betters and Donnell asked Bangor Police Department Officer Ryan Jones to

keep an eye on McCue.  <u>Donnell Dep.</u> at P. 42, L. 2-13.

34.      Officers Betters and Donnell then left McCue and went back to 18 First Street to

investigate what had happened there.  <u>Betters Dep.</u> at P. 46, L. 9-11; <u>Donnell Dep.</u> at P. 39,

L. 19-23.

35.     One of the residents of 18 First Street told Officers Betters and Donnell that McCue had been acting very erratically, was yelling and screaming to himself, and without any reason had jumped over a third floor balcony to the stairwell below.  Betters Dep. at P. 48, L. 23 – P. 49, L. 21.

36.     Someone at 18 First Street also told Officer Donnell that McCue was a bath salts user and that he may have been using bath salts that day.  Donnell Dep. at P. 41, L. 4-11.

37.     Officers Betters and Donnell then went outside the building at 18 First Street and saw McCue, who began yelling and screaming profanities at the officers, either gave them the middle finger or pumped his hands at the officers, and then challenged them to chase him. Donnell Dep. at P. 41, L. 24 – P. 42, L. 5 (McCue was yelling and screaming profanities and challenging them to chase him); Betters Dep. at P. 52, L. 9-24 (McCue either gave them the finger or pumped his hands saying "come on, come on, come on" to them).

38.     Around that same time, Officer Jones was in his cruiser in the vicinity of 18 First Street. Betters Dep. at P. 50, L. 15 – P. 51, L. 8; Transcript of Ryan Jones' Deposition (attached hereto as Exhibit 10) at P. 14, L. 25 – P. 15, L. 4.

39.     Officer Jones saw McCue running in the middle of First Street and he flashed his spotlight at McCue, but McCue ran past Officer Jones and fled the scene.  Jones Dep. at P. 15, L. 5-15 (he saw McCue running down the middle of First Street right at him and flashed his light at McCue, McCue ran past him); id. at P. 16, L. 13-19 (the light that he flashed at McCue was the spotlight); Betters Dep. at P. 50, L. 22 – P. 51, L. 3 (McCue darted around Officer Jones's cruiser).

40.     Based on what was then known about McCue's behavior and actions, Officer Betters got

on the radio and advised BPD units that McCue needed to be taken into protective custody for a professional evaluation. <u>Betters Dep.</u> at P. 50, L. 20-25; <u>Donnell Dep.</u> at P. 43, L. 7-12.

41.    The BPD has a policy entitled "Response to Mental Illness and Involuntary Commitment" which states it is the BPD's policy to assist individuals who appear to be mentally ill and/or who are experiencing a mental health crisis.  <u>BPD General Order – Response to Mental Illness And Involuntary Commitment</u> (attached hereto as Exhibit 11) (hereinafter "Involuntary Commitment Policy").

42.    The Involuntary Commitment Policy defines "mental health crisis" as behavior—including a loss of contact with reality and extreme agitation—that creates a threat of imminent and substantial physical harm to the person experiencing the behavior or to others and that appears to be of sufficient severity to require professional evaluation. <u>Involuntary Commitment Policy</u> at ¶ III(F).

43.    The Involuntary Commitment Policy defines "protective custody" as when an officer has reasonable grounds to believe that a person seems mentally ill and presents a threat of immediate and substantial physical harm to themselves or third persons.   <u>Involuntary Commitment Policy</u> at ¶ III(H).

44.    It also defines "threat of imminent and substantial physical harm" to include a reasonably foreseeable risk of harm to someone—including the person experiencing a mental health crisis—of serious self-injury, violent behavior or placing others in reasonable fear of serious physical harm, and/or impairment to such an extent that a person is unable to avoid harm or protect themselves from harm.  <u>Involuntary Commitment Policy</u> at ¶ III(I).

45.    The Involuntary Commitment Policy states that an officer facing a potential need to place a person in protective custody must assess the situation to determine if the person is

8

experiencing a mental health crisis and, if so, the officer must assess the safety of the public and consider available options such as involuntary commitment. <u>Involuntary Commitment Policy</u> at ¶ IV(B).

46.　　If an officer determines an individual needs to be taken into protective custody, the officer is to bring the person to a hospital for professional evaluation. <u>Involuntary Commitment Policy</u> at ¶ III(B) & IV(D).

47.　　Officers Christopher Blanchard, David Farrar, and Joshua Kuhn heard Officer Betters state that McCue needed to be detained for protective custody reasons. <u>Blanchard Dep.</u> at P. 21, L. 5 – P. 22, L. 25; <u>Farrar Dep.</u> at P. 55, L. 4-14; <u>Kuhn Dep.</u> at P.  25, L. 8-13.

48.　　After McCue ran past Officer Jones, Officer Jones turned his cruiser around and began looking for McCue. <u>Jones Dep.</u> at P. 17, L. 4-14.

49.　　At some point, Officers Farrar and Kuhn were riding together in a cruiser and encountered McCue near the intersection of First Street and Cedar Street. <u>Kuhn Dep.</u> at P. 30, L. 13-18; <u>Farrar Dep.</u> at P. 53, L. 21-23.

50.　　By the time Officers Farrar and Kuhn saw McCue near the intersection of First and Cedar, it was either dusk or dark. <u>Farrar Dep.</u> at P. 57, L. 15-20.

51.　　McCue was running in the roadway at that time, and Officers Farrar and Kuhn exited their cruiser to try to speak to McCue. <u>Farrar Dep.</u> at P. 54, L. 9-13; <u>Kuhn Dep.</u> at P. 30, L. 19-23.

52.　　McCue either said something unintelligible or snarled at the officers, and took off running again down Cedar Street. <u>Kuhn Dep.</u> at P. 30, L. 20-23; <u>Farrar Dep</u> at P. 59, L. 14-24; <u>id</u>. at Errata Sheet (correcting the word "small" to "snarl" on Page 59, Line 22).

53.　　Officer Jones eventually got to the intersection of Cedar Street and Main Street, and

9

proceeded straight through the intersection.  Jones Dep. at P. 19, L. 1-24.

54.     As he was doing so, Officer Jones saw McCue to his left running on Main Street.  Jones Dep. at P. 20, L. 2-25.

55.     As Officer Jones was turning his cruiser to go left, McCue ran out into the middle of Main Street in front of Officer Jones, who had to slam on his brakes to avoid hitting McCue. Jones Dep. at P. 21, L. 3-16.

56.     McCue then continued to run down the middle of Main Street.  Jones Dep. at P. 21, L. 17 – P. 22, L. 2.

57.     Officers Betters and Kuhn, who were driving separate cruisers, spotted McCue running on Main Street near Central Fire Station and the homeless shelter.  Kuhn Dep. at P. 35, L. 11-14; Betters Dep. at P. 55, L. 8-20.

58.     Officers Betters and Kuhn tried to box McCue in with their cruisers in order to prevent him from running out into traffic on Main Street, but McCue evaded them and ran out into the traffic.  Kuhn Dep. at P. 35, L. 16 – P. 36, L. 6 (there was active traffic on Main Street, the officers tried to use their cruisers to divert him from running into the street, but he ran around the back of Kuhn's cruiser into traffic); Farrar Dep. at P. 63, L. 2-19 (Farrar was riding with Kuhn, they attempted to box McCue in to prevent him from running in the roadway, but he ran around their car); Betters Dep. at P. 56, L. 8-18 (Betters was in his cruiser, asked other officers to pull up behind his cruiser to box McCue in, but McCue darted off behind Betters' cruiser and ran into Main Street); Donnell Dep. at P. 45, L. 9-17 (McCue ran behind Officer Kuhn's cruiser and darted across Main street right in front of traffic).

59.     Officers Farrar and Kuhn then exited the cruiser they were riding in and pursued McCue on foot into the middle of Main Street. Farrar Dep. at P. 64, L. 4-6; Kuhn Dep. at P. 36, L.

10-15.

60.    As Officers Farrar and Kuhn were chasing McCue in the middle of Main Street, McCue tripped and fell in the roadway.  Farrar Dep. at P. 64, L. 7-10; Kuhn Dep. at P. 36, L. 14-18.

61.    When Officers Farrar and Kuhn reached McCue, he was laying on his stomach.  Kuhn Dep. at P. 38, L. 11-15.

62.    The location where McCue ended up on the ground on Main Street was in front of Central Fire Station. Farrar Dep. at P. 71, L. 10-14 (describing the scene of the incident as including the Bangor Fire Department); Transcript of John York's Deposition (attached hereto as Exhibit 12) at P. 10, L. 14 – P. 11, L. 22 (struggle between McCue and the police was in Main Street across from Central Firehouse); Transcript of David Rudolph's Deposition (attached hereto as Exhibit 13) at P. 17, L. 1 – P. 18, L. 16 (McCue was on Main Street in front of the Central Fire Station at the time he ended up on the ground).

63.    Right around the same time, a Bangor Fire Department fire engine that was in the vicinity pulled across Main Street and parked there to block off traffic.  York Dep. at P. 10, L. 6-23; Rudolph Dep. at P. 18, L. 2-24.

64.    There were four Bangor Fire Department members on board that fire engine, three of whom were paramedics and one of whom was an emergency medical technician.  Rudolph Dep. at P. 14, L. 24 – P. 15, L. 3 (naming individuals in fire engine); id. at P. 21, L. 23 – P. 22, L. 4 (indicating three were paramedics and one was an EMT).

65.    In addition to the emergency personnel in the fire engine, there were other Bangor Fire Department emergency personnel standing nearby while the events with McCue unfolded. Farrar Dep. at P. 71, L. 15 – P. 72, L. 18 (stating that emergency personnel other than those in the fire engine were north of McCue); York Dep. at P. 16, L. 2-8 (stating that there were

individuals nearby standing in front of the bumper of an ambulance); <u>Betters Dep.</u> at P. 83, L. 8-10 (stating that there were EMT's and an ambulance standing "a few feet away" and watching the incident unfold); <u>Donnell Dep.</u> at P. 69, L. 22-25 (stating there were paramedics on the other side of the road); <u>Kuhn Dep.</u> at P. 50, L. 3-10 (stating there were EMTs several yards away from the event).

66.     The BPD has a policy entitled "Use of Force."   <u>BPD General Order – Use of Force</u> (attached hereto as Exhibit 14) (hereinafter "Use of Force Policy").

67.     The Use of Force Policy defines "non-deadly force" as "any physical force which is not deadly force."  <u>Use of Force Policy</u> at ¶ III(L).

68.     The Use of Force Policy states that electronic weapons are considered to be non-deadly force.  <u>Use of Force Policy</u> at ¶ III(F).

69.     The policy permits use of non-deadly force when and to the extent the officer reasonably believes it is necessary to effect an arrest or to prevent an escape from custody, unless the officer knows the arrest is illegal.  <u>Use of Force Policy</u> at ¶ V(A)(1)(a).

70.     It also permits the use of non-deadly force to defend the officer from what the officer reasonably believes to be the imminent use of non-deadly force encountered while attempting to effect an arrest or while seeking to prevent an escape.   <u>Use of Force Policy</u> at ¶ V(A)(1)(b).

71.     The MCJA teaches its students that when a suspect is on the ground, officers should handcuff the suspect in the prone position.   <u>30(b)(6) Deposition of the Maine Criminal Justice Academy</u> (attached hereto as Exhibit 15) at Page 80, Lines 4-10.

72.     Officers Farrar and Kuhn reached McCue at approximately the same time, with Officer Kuhn on McCue's left side and Officer Farrar on McCue's right side.  <u>Kuhn Dep.</u> at P. 38, L.

23 – P. 39, L. 2 (stating timing of them reaching McCue); id. at P. 40, L. 10-22 (stating position of the officers in relation to McCue).

73.     Officer Kuhn momentarily placed his chest on McCue's shoulder and asked McCue to give up his hands, but McCue refused and pulled them underneath his body.  Kuhn Dep. at P. 39, L. 3-6.

74.     Officers Kuhn and Farrar repeatedly gave McCue orders to give them his hands, but he refused, swore at the officers, and threatened to kill them.  Kuhn Dep. at P. 41, L. 4-10.

75.     Officer Kuhn placed his finger under a pressure point underneath McCue's nose in order to gain pain compliance to get McCue to give up his hands, but the pressure point hold had no effect on McCue.  Kuhn Dep. at P. 41, L. 7-10.

76.     The MCJA teaches its students that the use of a pressure point hold is an acceptable use of force to gain pain compliance over a subject.  Transcript of Brian MacMaster's Deposition (attached hereto as Exhibit 16) at Page 47, Lines 21-25.

77.     Officer Farrar struck McCue a couple of times in his arm in order to gain pain compliance to get McCue to give up his hands, but McCue refused.  Blanchard Dep. at P. 55, L. 3-9.

78.     Officers are trained that the use of strikes or punches to soft muscle tissue is an acceptable use of force to gain pain compliance.  MacMaster Dep. at P. 48, L. 1-5; Blanchard Dep. at P. 55, L. 1-6; id. at P. 97, L. 6-23.

79.     Officer Donnell arrived on the scene and got on top of McCue's legs because he was still kicking and resisting. Donnell Dep. at P. 52, L. 13-17.

80.     McCue continued to keep his arms underneath his body and to refuse to give them up, despite several attempts from the officers to get them out.  Donnell Dep. at P. 53, L. 2-8;

Kuhn Dep. at P. 43, L. 16-19.

81.    At this time, McCue was very agitated, thrashing and flailing around, grunting, growling, and at times demonstrating superhuman strength and resisting so forcefully that he was able to partially lift the officers off the ground. Blanchard Dep. at P. 55, L. 20-25 (McCue was agitated, thrashing, grunting, growling, and at times the officers were being lifted off the ground); York Dep. at P. 12, L. 19-23 (McCue was flailing around on the ground and exhibited superhuman strength).

82.    The officers had given McCue verbal commands to give up his hands and also attempted blows to his soft muscle tissue, but McCue refused and continued to resist.  Donnell Dep. at P. 56, L. 3-4.

83.    McCue did not appear to register any pain.  Kuhn Dep. at P. 42, L. 7-13.

84.    Officer Blanchard arrived on scene at some point while the other officers were struggling to gain control over McCue's arms, which were still hidden underneath his body.  Blanchard Dep. at P. 54, L. 22 – P. 55, L. 13.

85.    Officer Betters was the last to arrive at the scene, and he observed McCue fighting against the officers, swearing and growling at them, and the officers struggling to control him. Betters Dep. at P. 57, L. 10 – P. 58, L. 2.

86.    Officer Betters then left McCue and the other officers in order to direct traffic on Main Street with a flashlight, because it was dark out. Betters Dep.  at P. 65, L. 10 – P. 66, L. 1.

87.    For short periods of time while McCue was on the ground resisting arrest, Officer Kuhn had his knee on one of McCue's shoulders and Officer Farrar had his knee on McCue's other shoulder.  Kuhn Dep. at P. 64, L. 16-19 (explaining the orientation of the officers); id. P. 46, L. 20 – P. 47, L. 2 (explaining that he only placed his weight on McCue when McCue was

trying to get up, and that otherwise he kept his weight on the back of his feet); <u>Farrar Dep.</u> at P. 92, L. 15-26 (explaining that his weight shifted back and forth between his knee and McCue's shoulder).

88. Officers Kuhn and Farrar did not continuously have their weight on McCue's shoulders; it was only applied intermittently depending on McCue's level of resistance. <u>Kuhn Dep</u>. at P. 46, L. 20 – P. 47, L. 2; <u>Farrar Dep.</u> at P. 92, L. 15-26.

89. Officer Farrar was trained that when a suspect is prone on the ground resisting, it is proper procedure to place weight on the suspect's shoulder to gain control of the suspect's arm for safety reasons. <u>Farrar Dep.</u> at P. 42, L. 5-12.

90. The MCJA teaches its students that if a suspect is on the ground resisting arrest, officers should put pressure generally on the middle of the suspect's back in order to gain control over the suspect's arms. <u>MCJA Dep.</u> at P. 83, L. 13-25.

91. Officer Blanchard was also trained at the police academy in Vermont and as part of his Military Police training with the United States Army that it is a proper technique to apply force to a suspect's shoulders if the suspect is resisting while prone on the ground. <u>City of Bangor's Supplemental Interrogatory Answer</u> (attached hereto as Exhibit 17) at Pages 1 & 5.

92. Officer Donnell eventually warned McCue that she was going to "tase" him if he did not give up his arms, but he continued to refuse to do so. <u>Donnell Dep.</u> at P. 53, L. 6-8; <u>Blanchard Dep.</u> at P. 55, L. 14-19.

93. The BPD has a policy entitled "Electronic Control Weapons (TASER)." <u>BPD General Order – Electronic Control Weapons (Taser)</u> (hereinafter "ECW Policy") (attached hereto as Exhibit 18).

94. The ECW policy states that an electronic control weapon may be used when and to the

extent necessary the officer reasonably and actually believes it necessary to effect an arrest or to prevent the escape from custody of an arrested person. <u>ECW Policy</u> at ¶ I.

95.    The ECW policy informs officers that electronic control weapons reduce the need for hands-on physical force during an arrest, and when used properly can reduce the risk of injury to officers and suspects. <u>ECW Policy</u> at ¶ III.

96.    Officers are directed to use the electronic control weapon the least number of times necessary to accomplish their legitimate goals. <u>ECW Policy</u> at ¶ V(C)(3).

97.    The ECW policy states that the suspect's back should be their primary target when reasonably possible. <u>ECW Policy</u> at ¶ V(C)(4).

98.    The ECW policy does not prohibit officers from using electronic control weapons on subjects exhibiting signs of excited delirium. <u>ECW Policy</u> at ¶ V(C)(7).

99.    Pursuant to the ECW policy, officers are instructed to "keep in mind" that persons may be suffering from excited delirium and, if the officer believes that to be the case, medical attention shall be sought. <u>ECW Policy</u> at ¶ VII(E).

100.    Appendix #2 to the ECW policy lists electronic weapons as non-deadly force, and indicates that they are appropriate use of force options when a suspect is being resistive or assaultive / high risk. <u>ECW Policy</u> at Appendix #2.

101.    The MCJA teaches its students that the use of a Taser is an acceptable and commonly used tool for gaining restraint and control over a subject who is threatening the officer or resisting arrest. <u>MacMaster Dep.</u> at P. 48, L. 6-7; <u>MCJA Dep.</u> at P. 121, L. 14 – P. 122, L. 17.

102.    In terms of whether or not it is acceptable to use a Taser on a suspect exhibiting signs of excited delirium, the MCJA teaches its students that they must assess the situation and use

the situational use of force option that will eliminate the threat posed by the suspect.  MCJA Dep. at P. 64, L. 1-11.

103.    The MCJA teaches it students that there are peripheral issues that could happen if a Taser is used on someone exhibiting excited delirium, which could potentially include serious injury and death, but the bottom line is that the officer must eliminate the threat posed by the suspect.  MCJA Dep. at P. 64, L. 12-17.

104.    Officer Donnell was trained that her decision of whether or not to use a Taser should not hinge on whether or not the suspect may be exhibiting signs of excited delirium.  Donnell Dep. at P. 54, L. 20 – P. 55, L. 1.

105.    Officer Donnell "tased" McCue on the right side of his lower back with her Taser electronic control weapon.  Donnell Dep. at P. 53, L. 7-8 (stating she tased McCue); id. at P. 57, L. 8-10 (stating probes went into the right side of McCue's lower back); Blanchard Dep. at P. 55, L. 10-13 (stating he saw Officer Donnell tase McCue in the lower back).

106.    Officer Donnell utilized a combination of probe deployment mode and stun-drive mode with her Taser in order to maximize its effectiveness, which was necessary to complete the circuit because of how close she was to McCue.  Donnell Dep. at P. 53, L. 9-22; Blanchard Dep. at P. 55, L. 10-13.

107.    Officer Donnell only discharged the Taser once, which was one continuous cycle that lasted for a total of five seconds.  Donnell Dep. at P. 53, L. 23 – P. 54, L. 1; id. at P. 56, L. 22 – P. 57, L. 2; Blanchard Dep. at P. 55, L. 10-13.

108.    McCue was not yet handcuffed at the time the Taser was used.  Kuhn Dep. at P. 43, L. 23-25.

109.    During the Taser cycle, McCue gave up his right arm thereby enabling Officer Donnell

to grab ahold of his right wrist after the Taser cycle ended.  Donnell Dep. at P. 57, L. 3-7.

110.    Subsequently, Officer Kuhn was able to get ahold of McCue's left arm.  Donnell Dep. at

P. 57, L. 12-24.

111.    Even after the officers were able to grab McCue's arms, he resumed fighting with the

police.  Kuhn Dep. at P. 44, L. 22-25; id. at P. 46, L. 1-4.

112.    The officers eventually were able to get handcuffs onto McCue.  Donnell Dep. at P. 57,

L. 25 – P. 58, L. 2.

113.    After McCue was handcuffed, Officer Blanchard went to his cruiser to open the door so

that McCue could be transported to the hospital for a mental health evaluation.  Blanchard

Dep. at P. 58, L. 25 – P. 59, L. 9.

114.    Shortly thereafter, while Officer Donnell was removing the Taser probes from McCue's

back, he began violently thrashing his legs.  Donnell Dep. at P. 59, L. 1-4; Blanchard Dep. at

P. 59, L. 2-4.

115.    Officers Blanchard and Donnell then positioned themselves on McCue's legs in order to

restrain his legs and feet.  Donnell Dep. at P. 59, L. 5-7; Blanchard Dep. at P. 59, L. 3-4.

116.    They initially tried to handcuff McCue's feet together in order to gain control over them,

but the officers removed the handcuffs because they were too tight and were going to cut into

McCue's skin.  Donnell Dep. at P. 59, L. 13-20; Blanchard Dep. at P. 59, L. 10-20.

117.    Officer Donnell then went to her cruiser to look for something to restrain McCue's legs

in order to prevent him from thrashing and kicking, which could have caused injury to

himself and the officers. Donnell Dep. at P. 59, L. 21 – 25; Blanchard Dep. at P. 59, L. 21 –

P. 60, L. 3.

118.    Officer Donnell eventually returned to McCue, at which point McCue had trapped

18

Officer Blanchard's hand between his ankles. <u>Donnell Dep.</u> at P. 60, L. 7-12; <u>Blanchard Dep.</u> at P. 61, L. 6-16.

119.     McCue applied a great amount of pressure to Officer Blanchard's wrist, which caused Officer Blanchard extreme pain.  <u>Donnell Dep.</u> at P. 60, L. 7-12; <u>Blanchard Dep.</u> at P. 61, L. 6-16.

120.     Officer Blanchard could not pull his hand out from McCue's ankles, and he ordered McCue to release his hand and also delivered a series of punches to McCue's calf muscle to gain pain compliance in an effort to free his hand. <u>Blanchard Dep.</u> at P. 61, L. 7-16; <u>Donnell Dep.</u> at P. 60, L. 8-17.

121.     As a result of the injury that McCue inflicted on Officer Blanchard by trapping Officer Blanchard's hand between his ankles and squeezing, Officer Blanchard suffered torn ligaments between his ring and middle fingers and missed roughly four-and-a-half months of work.  <u>Blanchard Dep.</u> at P. 96, L. 18 – P. 97, L. 5.

122.     After Officer Blanchard was able to free his hand from McCue's ankles, he and Officer Donnell were able to secure McCue's ankles with flex cuffs that Officer Betters had retrieved.  <u>Blanchard Dep.</u> at P. 62, L. 11-16; <u>Donnell Dep.</u> at P. 61, L. 4-7.

123.     Officer Blanchard then inspected McCue's handcuffs to make sure they were double-locked, which is done to prevent the handcuffs from causing the suspect injury from the handcuffs tightening up on their wrists.  <u>Blanchard Dep.</u> at P. 62, L. 12-16 (stating he checked the handcuffs to make sure they were double locked); <u>Kuhn Dep.</u> at P. 65, L. 2-5 (explaining why handcuffs are double locked).

124.     As Officer Blanchard was checking McCue's handcuffs, McCue grabbed Officer Blanchard's hand and squeezed extremely hard, which was the same hand that McCue had

just crushed between his ankles.  Blanchard Dep. at P. 62, L. 17-20.

125.    In order to get McCue to release his hand, Officer Blanchard delivered one punch to McCue's upper thigh or buttock region.  Blanchard Dep. at P. 62, L. 18-21.

126.    Officer Blanchard had learned through training that punches are an acceptable use of force for distracting and gaining pain compliance over a subject. Blanchard Dep. at P. 97, L. 6-23.

127.    At some point or points while McCue was on the ground, Officer Kuhn placed his hand on the back of McCue's head to stabilize it in order to prevent him from whacking his head off of the ground.  Betters Dep. at P. 98, L. 24 – P. 99, L. 12.

128.    The MCJA teaches its students that if a suspect is on the ground, it is acceptable to control the suspect's head to prevent them from whacking their head off the ground. MacMaster Dep. at P. 50, L. 1-6.

129.    McCue continued kicking, thrashing around, grabbing at officers' hands, and resisting, so the officers secured him in a five-point restraint by tying one end of a dog leash to McCue's handcuffs and the other end to the zip ties securing McCue's ankles.  Blanchard Dep. at P. 62, L. 22-25 (McCue was still thrashing and resisting so they decided to utilize a five-point restraint); Betters Dep. at P. 71, L. 2-23 (McCue's feet were moving and he was fighting the police as they were trying to secure him in a five-point restraint, which was done by securing the dog leash to his handcuffs on one end and the zip ties on his ankles on the other end); Donnell Dep. at P. 63, L. 22 – P. 64, L. 9 (McCue was kicking, so they utilized a nylon dog leash to secure his hands and feet); Kuhn Dep. at P. 76, L. 16-23 (McCue was thrashing, resisting, and grabbing at officers' hands while they were trying to secure the restraints); id. at P. 104, L. 10-21 (McCue was restrained but not controlled, because he was

trying to kick around at officers, grabbing at their hands, squirming, grunting, and screaming).

130.   Officer Blanchard suggested that McCue be placed in a five point restraint as a safety measure to protect McCue and the officers, because McCue had continued to flail his legs and grab with his hands.  Blanchard Dep. at P. 97, L. 24 – P. 98, L. 4.

131.   The officers had been trained that when a subject is actively resisting, it is important to get the subject's legs, arms, and limbs under control.  Betters Dep. at P. 95, L. 5-10; Blanchard Dep. at P. 63, L. 1-7; City of Bangor's Supplemental Interrogatory Answer at Page 4.

132.   The MCJA teaches its officers that just because a suspect is handcuffed does not mean that they are subdued, that a handcuffed suspect can still be dangerous, and that officers must eliminate the threat posed by the suspect.  MCJA Dep. at P. 88, L. 2-16.

133.   Officer Blanchard had been trained by the criminal justice academy in Vermont and as part of his Military Police training with the United States Army that five point restraints are an acceptable technique to restrain and control combative subjects.  City of Bangor's Supplemental Interrogatory Answer at Pages 1 & 5.

134.   The purpose of placing McCue in the five-point restraint was to get him under control and to prevent him from continuing to kick at the police officers.  Donnell Dep. at P. 64, L. 5-7.

135.   The MCJA does not teach its students anything at all about five-point restraints, including whether it is an appropriate or inappropriate method of restraint. MCJA Dep. at P. 79, L. 5-12.

136.   Officers Betters and Blanchard held McCue's legs while Officer Donnell secured one

end of the dog leash to the zip ties around McCue's ankles and Officer Farrar secured the other end to McCue's handcuffs. <u>Betters Dep.</u> at P. 71, L. 10-16 (held one of McCue's legs); <u>Blanchard Dep.</u> at P. 70, L. 24 – P. 71, L. 1 (held McCue's feet down); <u>Donnell Dep.</u> at P. 65, L. 18-21 (secured the leash to the zip ties); <u>Farrar Dep.</u> at P. 89, L. 19-23 (secured it to McCue's handcuffs).

137.    When the five-point restraint was finalized, there were approximately 18 to 24 inches between the point where McCue's hands were secured and the point where McCue's feet were secured.  <u>Blanchard Dep.</u> at P. 98, L. 11-14.

138.    After McCue was secured in the five-point restraint, he was still conscious.  <u>Donnell Dep.</u> at P. 66, L. 6-11 (McCue was making noises at the officers after the five-point restraint was completed); <u>York Dep.</u> at P. 13, L. 10 – P. 14, L. 9 (McCue was "like a fish out of water . . . always moving around" and he "was still flopping" when the police picked him up off the ground); <u>Betters Dep.</u> at P. 109, L. 22 – P. 110, L. 1 (stating that McCue "was alive and breathing and fighting against us right up to the moment that I noticed he was unconscious.").

139.    The officers were constantly assessing McCue for threats and medical needs as part of their procedure throughout their encounter with McCue.  <u>Farrar Dep.</u> at P. 87, L. 9-13

140.    Within seconds of when the five-point restraint was completed, the officers picked McCue up and began carrying him to a nearby cruiser for transport to the hospital for a mental health evaluation.  <u>Blanchard Dep.</u> at P. 82, L. 11-13 (the five point restraint was completed seconds before McCue was picked up); <u>Donnell Dep.</u> at P. 66, L. 17-20 (as soon as McCue was under control, they picked him up to move him to the cruiser); <u>Kuhn Dep.</u> at P. 47, L. 9-13 (when McCue was finally restrained, they picked him up to move him to the

cruiser for transport).

141.    Officer Farrar had assessed McCue within seconds of when McCue was picked up off the ground.  Farrar Dep. at P. 87, L. 14-23.

142.    As of his last assessment of McCue, Officer Farrar still viewed McCue as a threat.  Farrar Dep. at P. 87, L. 25 – P. 88, L. 5.

143.    At some point shortly after they picked McCue up off the ground, the officers noticed that McCue become unresponsive.  Blanchard Dep. at P. 72, L. 6 – P. 73, L. 14 (stating he observed McCue exhibit muscle movement seconds before the officers attempted to put him in the car, and as the officers were attempting to put McCue in the car, Officer Blanchard saw McCue's head go from erect to limp); Donnell Dep. at P. 69, L. 17-19 (someone mentioned McCue's body went limp after they opened the cruiser door); Kuhn Dep. at P. 47, L. 6 – P. 48, L. 21 (when they picked McCue up off the ground, he noticed McCue was unresponsive); Betters Dep. at P. 83, L. 2-15 (he noticed McCue was unresponsive when they got to the rear door of the cruiser); Farrar Dep. at P. 72, L. 19 – P. 73, L. 1 (he noted that McCue was unresponsive as they were carrying him to the cruiser).

144.    Almost instantaneously after recognizing that McCue was unresponsive, Officer Betters physically motioned to the Bangor Fire Department personnel who were located nearby to come over and provide medical assistance.  Betters Dep. at P. 83, L. 3-15; Donnell Dep. at P. 69, L. 23-25; Kuhn Dep. at P. 49, L. 23 – P. 50, L. 2; Blanchard Dep. at P. 75, L. 6-10.

145.    Officer Betters also simultaneously communicated to them via radio about the need for immediate medical assistance.  Betters Dep. at P. 83, L. 3-15; Donnell Dep. at P. 69, L. 23-25; Kuhn Dep. at P. 49, L. 23 – P. 50, L. 2; Blanchard Dep. at P. 75, L. 6-10.

146.    The fire department personnel, which consisted of at least three paramedics and one

EMT, reached McCue within seconds of being summoned by Officer Betters. <u>Kuhn Dep.</u> at P. 50, L. 11-16 (it only took the emergency responders "seconds" to respond); <u>Betters Dep.</u> at P. 83, L. 3-15 (the emergency responders "literally" drove across the street and were right on scene); <u>Donnell Dep.</u> at P. 69, L. 22-25 (the emergency responders came over "immediately"); <u>York Dep.</u> at P. 18, L. 1-8 (stating that "everything was almost simultaneously [sic]") in terms of the medical response).

147.    The entire time from when McCue was first picked up off of the ground until he was first attended to by the emergency medical responders was a matter of seconds. <u>Farrar Dep.</u> at P. 79, L. 25 – P. 80, L. 9.

148.    As the emergency responders were on their way to assist, Officer Blanchard cut the nylon rope that was securing McCue's handcuffs to his leg restraints. <u>Blanchard Dep.</u> at P. 75, L. 12 – P. 76, L. 1.

149.    The emergency medical responders then began providing medical attention to McCue, and eventually he was taken to the hospital via ambulance. <u>York Dep.</u> at P. 18, L. 1 – P. 20, L. 3; <u>Rudolph Dep.</u> at P. 29, L. 3-12; <u>id</u>. at P. 41, L. 1 – P. 42, L. 20.[2]

150.    The only thing that the MCJA teaches its students about the connection between prone restraint and the risk of positional asphyxia is that after a suspect is secured and placed into a police cruiser, the suspect should be placed in a seated position and not face down on their stomach in the back of the cruiser. <u>MCJA Dep.</u> at P. 93, L. 18 – P. 95, L. 25.

---

[2]    It is undisputed that McCue eventually died. Despite the fact that the medical records from Eastern Maine Medical Center and the autopsy report from the Office of the Chief Medical Examiner both unequivocally state that McCue died on September 17, 2012, Plaintiff apparently disputes the date of his death. Plaintiff also disagrees with the medical records indicating that McCue had a cardiac arrest and the autopsy report indicating the cause of death was due to a complication from Alpha-PVP poisoning, as Plaintiff apparently contends McCue died from asphyxiation. However, Plaintiff's disputes as to those points are not material for purposes of deciding the instant Motion.

151.    Officer Blanchard had only been trained that if a suspect has been in a five point restraint for an extended period of time, the risk of asphyxia is something to be aware of and to monitor the suspect.  City of Bangor's Supplemental Interrogatory Answers at Pages 1 & 5.

152.    None of the officers had ever been trained that it is inappropriate to place weight on the shoulders or upper back of a prone suspect.  Farrar Dep. at P. 42, L. 13 – P. 43, L. 8; Kuhn Dep. at P. 52, L. 8-24; Donnell Dep. at P. 58, L. 17-19; Betters Dep. at P. 74, L. 9 – P. 75, L. 10; Blanchard Dep. at P. 78, L. 18 – P. 79, L. 21.

153.    Officer Blanchard used to be an emergency medical technician in approximately 2000, but is not anymore.  Blanchard Dep. at P. 88, L. 12-23.

154.    Officer Blanchard had previously been trained as an emergency medical technician that a sign of asphyxia is cyanosis, or the bluing of the lips.  Blanchard Dep. at P. 87, L. 11-13.

155.    Officer Blanchard never saw McCue exhibit any signs of cyanosis. Blanchard Dep. at P. 98, L. 21-25.

156.    The officers' goal at all times during the physical encounter with McCue was to get him restrained and under control so that he could be transported to the hospital for an evaluation. Donnell Dep. at P. 81, L. 9-14; Kuhn Dep. at P. 107, L. 11-15; Blanchard Dep. at P. 81, L. 18-25; Betters Dep. at P. 96, L. 17-21.

157.    The MCJA only trains its officers in the "ABCs" of tactical first aid, which relates to issues involving airways, breathing, circulation, and hemorrhaging. 30(b)(6) Dep. of MCJA at P. 71, L. 21 – P. 72, L. 3.

158.    Part of the MCJA's tactical first aid training is that if a suspect is having a medical issue related to airways, breathing, or circulation, the officer should get help from experienced medical professionals so the professionals can render the appropriate medical aid that the

25

suspect needs.  <u>30(b)(6) Dep. of MCJA</u> at P. 74, L. 10 – P. 75, L. 24.

159.     The cruiser video recording system from Cruiser No. 15 captured limited portions of the

officers' interactions with McCue prior to the physical interaction with him on Main Street.

<u>Compact Disc Containing Video From Cruiser No. 15</u> (attached hereto as Exhibit 19,

consisting of two CD's labeled Car #15 1 of 2 and Car # 15 2 of 2, respectively).

160.     The cruiser video recording system from Cruiser No. 22 captured much of the physical

altercation between McCue and the officers on Main Street. <u>Compact Disc Containing Video</u>

<u>From Cruiser No. 22</u> (attached hereto as Exhibit 20).

Dated at Bangor, Maine, this the 16th day of April, 2015.

/s/ Frederick J. Badger, Jr., Esq.
/s/ Joshua A. Randlett

Frederick J. Badger, Jr., Esq.
fbadger@rwlb.com
Joshua A. Randlett, Esq.
jrandlett@rwlb.com
Attorneys for the Bangor Defendants

**RICHARDSON, WHITMAN, LARGE & BADGER**
One Merchants Plaza
P. O. Box 2429
Bangor, ME  04402-2429
(207) 945-5900

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua A. Randlett, Esq., of Richardson, Whitman, Large & Badger, attorneys for the Bangor Defendants, hereby certify that on April 16, 2015, I electronically filed the foregoing *Statement of Material Facts in Support of Defendants' Joint Motion for Summary Judgment* with the Court via the CM/ECF electronic filing system, which will send notification of such filing to all counsel of record in the above-captioned matter.

/s/ Joshua A. Randlett
Joshua A. Randlett, Esq.
Richardson, Whitman, Large & Badger