
```
                UNITED STATES DISTRICT COURT
                     DISTRICT OF MAINE


                                 Civil Action
                                 Case No. 1:14-cv-00098-GZS


* * * * * * * * * * * * * * * * * * *
                                    *
MICHAEL MCCUE, individually and as  *
Personal Representative of the Estate *
of Phillip McCue, Deceased,         *
                                    *
              Plaintiff             *
                                    *
     v.                             *
                                    *
CITY OF BANGOR, MAINE, et al.,      *
                                    *
              Defendants            *
                                    *
* * * * * * * * * * * * * * * * * * *


              DEPOSITION OF:   BRUCE OAKES



     BEFORE:  Lisa Fitzgerald, Notary Public, at the offices

of Richardson, Whitman, Large & Badger, One Merchants Plaza,

Bangor, Maine on September 26, 2014, beginning at 1:30 p.m.



David Van Dyke, Esq.                      For the Plaintiff

Joshua A. Randlett, Esq.                  For the
                                          City of
```

EXHIBIT 7

MICHAEL MCCUE v. CITY OF BANGOR
OAKES, BRUCE on 09/26/2014

Pages 6..9

Page 6
1  A. Yes.
2  Q. And that's what brings you here today?
3  A. Yes.
4  Q. Before we get started, have you taken any medication,
5     drugs, alcohol, anything like that today that would
6     impact your ability to answer questions?
7  A. No.
8  Q. What's your current residence address?
9  A. I now live at 12 Annex Road in Greenbush, Maine.
10 Q. Okay. That's a little bit of a haul for you to get in
11    here today.
12 A. Well, I've been back and forth several times.
13 Q. I appreciate your efforts.
14 A. I work in Bangor.
15 Q. Where were you living as of September 12th, 2012?
16 A. That would be 18 First Street in Bangor, Maine.
17 Q. Do you recall what room you were living in at the time?
18 A. Room 7.
19 Q. Okay. What floor was that on?
20 A. The second floor.
21 Q. Okay. Is that a three-story building at 18 First
22    Street?
23 A. Yes.
24 Q. Have you ever met an individual by the name of Phillip
25    McCue?

Page 7
1  A. Yes.
2  Q. Okay. And how did you know him?
3  A. Just passing in the hall. I kept my door open most of
4     the time, and he would say hi from time to time.
5  Q. Did he also live at 18 First Street?
6  A. Yes, he did.
7  Q. And this would have been around September 12th, 2012?
8  A. Yes.
9  Q. Do you remember what room Mr. McCue lived in?
10 A. I believe it was Room 13 on the third floor.
11 Q. So he was on the third floor?
12 A. Yes.
13 Q. I would represent to you that at some point on the day
14    of September 12th, 2012, Mr. McCue had an interaction
15    with members of the Bangor Police Department.
16      Are you aware of that fact?
17 A. I am.
18 Q. Okay. Do you recall what was going on on
19    September 12th, 2012, generally speaking with regards to
20    Mr. McCue?
21 A. He was on the third floor. I heard a whole lot of
22    noise, ranting and raving, through a closed fire door at
23    the bottom of the stairs leading up to the third floor.
24      I had my door open, so I opened the fire door a
25    couple of inches just to verify who I heard.

Page 8
1     At that point I went back to my room, I wasn't sure
2  what to do, didn't know what kind of a situation was
3  going on and I wasn't going to go up and walk into it.
4  This continued on for quite some time.
5     At that point I called the manager, Milton Reed on
6  the first floor and let him know that something was
7  going on on the third floor.
8     Before he could come up, I had opened the fire door
9  again and continued to listen. His voice was -- his
10 voice -- Phillip McCue's voice was escalating, getting
11 louder, ranting and raving, and at that point I knocked
12 on my neighbor's door, Joel Pelletier, and consulted
13 with him on whether we should call the Bangor PD or not.
14    At that time he wasn't sure. I decided to let
15 Milton handle it, but as the ranting continued, Milton
16 had some up -- Milton's in poor health -- he went up to
17 the third floor and the ranting and raving continued.
18    At that point I felt that Milton was probably in
19 danger, so I called the Bangor PD, and I'm not totally
20 sure exactly what I said. I did let them know that
21 there was a situation on the third floor. I did not
22 know whether there was alcohol involved or drugs, but it
23 was very bizarre. At that point I let Joel Pelletier
24 know.
25    A short time later Milton Reed came back down, and

Page 9
1  I reported to Milton Reed that we had called the Bangor
2  PD. So we all proceeded down to the first floor to wait
3  for the Bangor PD to let them in.
4     Officer -- I want to say Donnell, it was a female
5  police officer, showed up probably about 20 minutes, 15,
6  20 minutes later and came right up to the building. We
7  let her in.
8     She stood there. She asked what the situation was,
9  and I let her know that -- Milton also let her know that
10 there was a party on the third floor that seemed to be
11 out of control, and she wanted to know exactly what we
12 meant, so I let her know about his ranting and raving.
13    The ranting and raving consisted of a lot of
14 expletives, F-word, F-you and F-this and F-that. I'm
15 going to party. We're going to drink, we're going to
16 drug.
17    I don't know exactly what all he meant by it, so
18 the officer took down the information, and she consulted
19 with Milton a little more.
20    Probably 8 minutes into the conversation with the
21 Bangor police officer, we heard a tremendous crash noise
22 above us. At that point the officer took off up the
23 stairs, and I was right behind her because it's a big
24 building and there's lots of ways to get around in it.
25 So I was there to assist her if she needed it.



Page 10

1  She got to the top of the first floor flight of
2  stairs, the second floor, and the crash apparently was
3  him coming down from the third floor to the second
4  floor.
5      He ran down the hall, and when he saw her, he
6  jumped back and threw a bottle of beer, I believe it was
7  a sealed bottle. He just missed her, hit the door frame
8  to her right. It shattered, glass went everywhere, and
9  he ran through -- because it was like a little
10 cul-de-sac, he ran by her and down the back stairs.
11     She asked at that point where he might be going,
12 and I told her that he was going out the back way, the
13 back entrance.
14     She wasn't sure at that point whether to pursue him
15 that way or to go down the front way. I just jumped out
16 of the way and let her choose. She went out the front
17 way and out the door. I don't know what happened from
18 that point, as it was outside the building and I was
19 inside.
20     I had to go from there down to Shaw's and pick up
21 somebody that was buying groceries and come back to the
22 building.
23     I don't know -- at that time I wasn't aware of
24 anything, of the chase, any foot chase, or anything at
25 the fire station other than what I heard through the

Page 11

1  grapevine, and I believe in the newspaper.
2  Q. Okay. I didn't mean to cut you off if you were still
3     going.
4  A. No.
5  Q. I have just a few follow-up questions I wanted to ask
6     based on that.
7         You said at first, I believe, you heard some noise
8     was the first thing that got your attention?
9  A. That's correct.
10 Q. Where were you when you heard that noise?
11 A. In my room, Room 7.
12 Q. How would you describe the noise?
13 A. Ranting and raving, hollering at the top of his lungs.
14 Q. Was it loud?
15 A. Yes.
16 Q. And what do you mean by ranting and raving?
17 A. Ranting and raving, hollering, F-this and F-that. We're
18    going to party. Do you want to party? We're going to
19    have a party. And he was pacing back and forth. You
20    could hear him stomp his feet going back and forth just
21    continuous.
22 Q. And at some point did you open your door to look out?
23 A. My door was already open.
24 Q. Okay. And were you able to verify who was making this
25    noise?

Page 12

1  A. No.
2  Q. Not at that -- at any point during your observations
3     were you able to see who was making the noise?
4  A. Not see but hear. Once I opened the fire door a couple
5     of inches, I was able to figure out whose voice it was.
6  Q. Okay. Were you able to recognize the voice?
7  A. Yes.
8  Q. And whose voice was it?
9  A. Phillip McCue.
10 Q. And a few minutes ago you said that you had spoken to
11    Milton Reed, the building manager, about what you had
12    observed; do you remember what you told Milton?
13        MR. VAN DYKE: I think what he had heard.
14        MR. RANDLETT: I'm sorry.
15 BY MR. RANDLETT:
16 Q. I believe you said a few minutes ago that you had spoken
17    to Milton Reed about what you had heard.
18        Do you remember what you told Milton Reed?
19 A. Yes. I told Milton Reed, yes. I told Milton Reed that
20    there was something going on on the third floor and told
21    him about the ranting and raving and the continuous
22    going back and forth, back and forth, the pacing.
23 Q. Any of the ranting and raving that you heard, did you
24    hear anything specifically about drugs?
25 A. Partying. Just partying.

Page 13

1  Q. And I think you said at one point Mr. Reed went upstairs
2     to investigate what was going on; is that accurate?
3  A. Yes.
4  Q. And I think you said at some point you were concerned
5     for Mr. Reed?
6  A. Yes.
7  Q. Why were you concerned for him?
8  A. Because the ranting and raving actually made my blood
9     curdle, it kind of spooked me, and even though Milton's
10    got a backbone, Milton was very old and in very poor
11    health.
12 Q. Were you worried for his safety?
13 A. Yes.
14 Q. And I think you said that your neighbor came over to
15    your room at one point?
16 A. I went over to his.
17 Q. You went over to his room. Was that Mr. Pelletier?
18 A. Yes.
19 Q. And what did you two do at that point?
20 A. I asked him if he heard what was going on. His door had
21    been shut, so he didn't hear. And once the door was
22    open -- and I had asked him about this -- he listened
23    for a minute and heard the same thing.
24 Q. And I think you described the behavior that you observed
25    as very bizarre; is that accurate?



Page 14

1  A.  That's correct.
2  Q.  What do you mean by that?
3  A.  Just ranting and raving, pacing back and forth for a
4      long period of time. The more he paced, the louder he
5      got with his ranting and raving.
6  Q.  Did you ever see Mr. McCue pacing back and forth?
7  A.  No, I didn't.
8  Q.  Okay. You said somebody called the police?
9  A.  That's correct.
10 Q.  Who was it that called the police?
11 A.  That was myself.
12 Q.  That was you?
13 A.  Yes.
14 Q.  Do you remember what you told the police when you called
15     them?
16 A.  I told them that there was a person on the third floor
17     ranting and raving in a very loud voice, pacing back and
18     forth, that I did not know whether it was drug related
19     or alcohol related, but I felt that it needed to be
20     investigated, checked out.
21 Q.  All right. Then I think you said you and Mr. Pelletier
22     waited down front after you called the police?
23 A.  No. It was me and Milton Reed.
24 Q.  You and Mr. Reed waited down front?
25 A.  Yes.

Page 15

1  Q.  Okay. And at some point you said Officer Donnell showed
2      up?
3  A.  That's correct.
4  Q.  Did you speak to her at that point?
5  A.  Yes.
6  Q.  Do you remember what you told her at that point?
7  A.  As soon as we let her in, she asked what the problem
8      was, and I told her that we had a party on the third
9      floor that was ranting and raving, pacing pack and
10     forth, and the longer he paced, the louder he got with
11     his ranting and raving.
12 Q.  And I think you said that after -- correct me if I'm
13     wrong, I don't want to put words in your mouth -- but I
14     think you said that you followed Officer Donnell as she
15     went up the stairs to investigate, and you saw Mr. McCue
16     throw a bottle of beer.
17     Did I get that accurate?
18 A.  That's correct.
19 Q.  Okay. Did it appear to you that he was just throwing
20     the bottle randomly, or did it look like he was throwing
21     a bottle at somebody?
22 A.  I felt like he was throwing it at her, it landed very
23     close to her.
24 Q.  Roughly how far away from the officer do you think the
25     bottle landed?

Page 16

1  A.  1 foot, if that.
2  Q.  Where did it hit in relation to her body?
3  A.  Her right side -- on the door casing right beside her.
4  Q.  So it hit a door that she was standing next to?
5  A.  A door casing.
6  Q.  All right. And then at some point did you see Mr. McCue
7      run out of the building?
8  A.  Yes, I did.
9  Q.  Did you observe Mr. McCue do anything after the point
10     that he ran out of the building?
11 A.  No, I did not.
12 Q.  And you said that you had gone down to Shaw's at some
13     point later; is that correct?
14 A.  That's correct.
15 Q.  Would that be the Shaw's on Main Street?
16 A.  Yes.
17 Q.  When you went to the Shaw's on Main Street, did you see
18     anything -- excuse me, strike that.
19     Did you see Mr. McCue at that point?
20 A.  I did not.
21 Q.  Okay. I would represent to you that at some point that
22     night Mr. McCue interacted with the police on Main
23     Street.
24     Did you see any of that?
25 A.  None of it.

Page 17

1      MR. RANDLETT: That's all I have for questions for
2  you at this point. Mr. Van Dyke might have some
3  questions for you.
4      THE WITNESS: Okay.
5          EXAMINATION
6  BY MR. VAN DYKE:
7  Q.  What you heard on the third floor was an individual
8      boisterously, loudly yelling, let's go party, let's go
9      party, things like that; correct?
10 A.  That's correct.
11 Q.  He didn't appear to be fighting with anyone, did he?
12 A.  Nobody at all, no.
13 Q.  He didn't appear to be violent in any way?
14 A.  I felt that he was being violent just by being as loud
15     as he was with ranting and raving. It goes against the
16     building rules.
17 Q.  I understand that he was breaking rules; is that
18     correct?
19 A.  Yes.
20 Q.  Because the rules call for quiet after a certain hour?
21 A.  That's correct.
22 Q.  And he was breaking the rule of being quiet?
23 A.  Yes.
24 Q.  But he wasn't in any kind of an altercation with any
25     person, was he?



Page 22

1 Q. Who did you hear that from?
2 A. I believe that was in the Bangor Daily.
3 Q. But you knew nothing about that part of the evening?
4 A. No.
5     MR. VAN DYKE: Nothing further. Thank you, sir.
6     MR. RANDLETT: I don't have any further questions.
7     Mr. Oakes, you have the right to do what's called
8 read and sign, which means that once the transcript is
9 ready, you'll have a period of 30 days to look it over
10 and make any corrections for anything that you may feel
11 is inaccurate.
12     If you wish to exercise that right, you just let
13 Lisa know. You can also waive that right if you don't
14 feel like you want to do that. It's completely up to
15 you.
16     THE WITNESS: Okay. I think I would like to. I
17 want to make sure it's right.
18     (The deposition was concluded at 1:51 p.m.)
19
20
21
22
23
24
25

Page 23

CERTIFICATE

I, Lisa Fitzgerald, a Notary Public in and for the State of Maine, hereby certify that on September 26, 2014, personally appeared before me BRUCE OAKES, the within-named deponent, who was sworn to testify to the truth, the whole truth, and nothing but the truth, in the cause of action MICHAEL MCCUE, individually and as Personal Representative of the Estate of Phillip McCue, Deceased v. CITY OF BANGOR, MAINE, et al., now pending in the UNITED STATES DISTRICT COURT, DISTRICT OF MAINE; and that this deposition was stenographically reported by me and later reduced to typewritten form with the aid of computer-aided transcription; and the foregoing is a full and true record of the testimony given by the witness.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

I further certify that the adverse party was duly notified according to law to attend at the taking of said deposition and did attend.

IN WITNESS WHEREOF, I subscribe my hand and affix my seal this October 3, 2014. *Lisa Fitzgerald*

LISA FITZGERALD, NOTARY PUBLIC
Court Reporter

My commission expires: May 10, 2018

