

```
 1                 UNITED STATES DISTRICT COURT
                        DISTRICT OF MAINE
 2

 3                                      Civil Action
                                        Case No. 1:14-cv-00098-GZS
 4

 5
     * * * * * * * * * * * * * * * * * *
 6                                      *
     MICHAEL MCCUE, individually and as  *
 7   Personal Representative of the Estate *
     of Phillip McCue, Deceased,         *
 8                                       *
                Plaintiff                *
 9                                       *
         v.                              *
10                                       *
     CITY OF BANGOR, MAINE, et al.,      *
11                                       *
                Defendants               *
12                                       *
     * * * * * * * * * * * * * * * * * *
13

14

15              DEPOSITION OF:   CHARLES CROMWELL

16

17

18      BEFORE:  Lisa Fitzgerald, Notary Public, at the offices

19   of Richardson, Whitman, Large & Badger, One Merchants Plaza,

20   Bangor, Maine on September 26, 2014, beginning at 10:05 a.m.

21

22

23   David Van Dyke, Esq.                    For the Plaintiff

24   Joshua A. Randlett, Esq.                For the D[efendant]
     Frederick J. Badger, Jr., Esq.          City of B[angor]
25
```

EXHIBIT 9

MICHAEL MCCUE v. CITY OF BANGOR
CROMWELL, CHARLES on 09/26/2014

Pages 6..9

**Page 6**

1  the subpoena.
2     You've seen those before; correct?
3  A. I've seen this before (indicates), but I guess, no, I've
4     never seen this page before.
5  Q. The subpoena is what brings you here today; correct?
6  A. Hm-hmm (indicates yes).
7  Q. What's your -- strike that.
8     Before arriving here today, have you taken any
9     medications, alcohol, or drugs that will impact your
10    ability to --
11 A. Not today, no.
12 Q. What's your current residence address?
13 A. I'm homeless.
14 Q. Okay. What's the best way for us to reach you if we
15    need to get in touch with you?
16 A. My mother's cell phone number is a message number. You
17    can leave a message with her, and she can get it to me
18    that day or the next day.
19 Q. Okay. And do you know what her cell phone number is?
20 A. 702-1851.
21 Q. What was your residence address as of September 12th,
22    2012?
23 A. I was living on First Street, I think it was 11 First
24    Street or 9 First Street.
25 Q. Could it have been 18?

**Page 7**

1  A. Yes, 18 First Street.
2  Q. Okay. Do you remember what room you were in at that
3     time?
4  A. Yes. I was on the third floor of the building.
5  Q. Have you ever met an individual by the name of Phillip
6     McCue?
7  A. Yes.
8  Q. And how did you know him?
9  A. Through his brother, James McCue. We were residing
10    together before that at Fairmount Boarding Home.
11 Q. Do you recall whether or not Mr. McCue also lived at 18
12    First Street during September of 2012?
13 A. I helped him get an apartment there and get connected to
14    the manager of the building and the landlord of the
15    building, and I told him it would be nice to have a
16    friend live next door. There was a room available, and
17    he rented it out.
18 Q. Okay. Was he also on the third floor next to you?
19 A. Yes.
20 Q. Okay. Are you aware of the fact that Mr. McCue had a
21    certain interaction with the Bangor Police Department on
22    September 12th, 2012?
23 A. I wasn't aware of that until the next morning.
24 Q. Okay. But are you aware of that now?
25 A. Yes, now I am.

**Page 8**

1  Q. I'd like to focus on the few days leading up to
2     September 12th, 2012.
3     Did you spend any time with Mr. McCue during that
4     time frame?
5  A. Hardly any.
6  Q. Okay. Had you -- do you remember whether or not you had
7     done any form of drugs with Mr. McCue in the couple of
8     days leading up to September 12th?
9  A. I didn't do any with him. I did some on my own.
10 Q. Okay. Do you know if he had done any?
11 A. I have no idea. I suspect so.
12 Q. And why would you suspect so?
13 A. Because that's just the way the interaction happens.
14 Q. Did you know Mr. McCue to be somebody that used drugs?
15 A. Yes.
16 Q. Had you used them with him before?
17 A. Not really, no. Not the hard drugs. I had used
18    narcotics with him before but nothing -- nothing that
19    would have changed, you know, the way of life.
20 Q. Okay. I'd like to direct your attention to the day of
21    September 12th, 2012.
22    Did you spend any time with Mr. McCue on that day?
23 A. No, I didn't.
24 Q. Okay. Did you do any drugs with Mr. McCue on that day?
25 A. No.

**Page 9**

1  Q. Do you know if he did any drugs that day?
2  A. I'm sure he did from what I heard from inside my room.
3     I had to lock my door that night.
4     MR. VAN DYKE: I'm going to preserve all of these
5     kinds of hearsay, et cetera, objections obviously until
6     the point of trial.
7     Just so you know, hearsay is what you hear from
8     someone else as opposed to what you see yourself.
9     THE WITNESS: Hm-hmm.
10    MR. VAN DYKE: And I'm just making a formal
11    objection to preserve all those kinds of objections for
12    trial.
13    Go ahead and testify. It's a lawyer thing.
14 BY MR. RANDLETT:
15 Q. Okay. So you said at some point that you heard
16    something that night?
17 A. I heard Phil screaming quite loudly until I got to sleep
18    that night.
19 Q. Okay. And that would have been on September 12th?
20 A. I guess so, yeah.
21 Q. Do you remember about what time of the day or the night
22    it was?
23 A. It must have started around 9:30.
24 Q. Okay. And what did you hear?
25 A. I heard him using a lot of large words. It seemed like



Page 10

1   he might have been -- it seemed like he might have been
2   searching through a Bible just blurting out whatever he
3   thought was interesting.
4       Two words I distinctly remember were recompense and
5   renewal that he had literally screamed at the top of his
6   lungs, and I was scared. I locked my door and I went to
7   bed.
8       The next morning my neighbor came and told me that
9   he was dead, and I didn't believe that, but he told me
10  what happened.
11  Q. Okay. Were you able to hear this yelling when you were
12     physically in your room?
13  A. Yeah.
14  Q. Okay. At any point did you open your door to see what
15     was going on?
16  A. No.
17      (Deposition Exhibit No. 3, Bangor Police Department
18      Incident Report, was marked for identification.)
19  BY MR. RANDLETT:
20  Q. Mr. Cromwell, I'll show you what's been marked as
21     Exhibit No. 3, and I'll give this to you. Feel free to
22     look through it if you want.
23         What it is, it's a police record --
24  A. Hm-hmm.
25  Q. -- dated September 13th, 2012.

Page 11

1   A. Okay.
2   Q. Feel free to look it over and let me know when you're
3      done.
4   A. Okay.
5   Q. Okay. So have you read the record that is marked as
6      Exhibit 3?
7   A. Yes, I have.
8   Q. Okay. Having read that, does it refresh your
9      recollection about whether or not you had done any drugs
10     with Mr. McCue on September 12th?
11  A. Not really, no.
12  Q. Okay. Does that mean you don't remember, or does that
13     mean that you didn't?
14  A. I -- I -- I didn't use what they explained I used with
15     him, no.
16  Q. Okay. Did you use anything with him that you recall
17     that day?
18  A. No, not really.
19  Q. Did you see any interactions with Mr. McCue and the
20     Bangor Police Department at 18 First Street that night?
21  A. No, I didn't.
22  Q. And I would represent to you that Mr. McCue had
23     interactions with the Bangor Police Department later
24     that night on Main Street.
25         Did you see any of that?

Page 12

1   A. No, I didn't.
2      MR. RANDLETT: That's all I have for questions.
3      Attorney Van Dyke might have something for you.
4          EXAMINATION
5   BY MR. VAN DYKE:
6   Q. You were Phil's closest friend on the floor, you think?
7   A. I was Phil's only friend on the floor.
8   Q. Jeff Mishou was on the floor as well?
9   A. I don't know him.
10  Q. How about Jeremy Scripture?
11  A. I've never heard the name.
12  Q. There's different pronunciations I've heard of that
13     name.
14  A. I guess you could be mentioning the neighbors that were
15     also on the floor.
16  Q. Did you know them?
17  A. But I don't know them personally.
18      MR. RANDLETT: Scripture, I think?
19      MR. VAN DYKE: I've heard it pronounced a number of
20     different ways. Scripture, Specklar [phonetic].
21  BY MR. VAN DYKE:
22  Q. Does that -- Jeremy mean anything to you, the name
23     Jeremy?
24  A. No, he was across the hall from me. But, I mean, the
25     specific Jeremy you're mentioning must have been the one

Page 13

1      across the hall from me.
2   Q. But you didn't know him particularly?
3   A. No.
4   Q. You didn't particularly know Mr. Mishou?
5   A. No.
6   Q. So at some point starting around 9:30 at night you're in
7      your room; correct?
8   A. Yes.
9   Q. And you hear Phil McCue loudly yelling things; correct?
10  A. Yeah.
11  Q. Did he seem to be in the hallway or in his room or
12     where?
13  A. He seemed to be in his room right near the door.
14  Q. And your room was adjacent to his?
15  A. Yes, right next to it.
16  Q. You did not go outside during this period?
17  A. No.
18  Q. So your best sense is that he was in his room but
19     screaming fairly loudly?
20  A. Yeah.
21  Q. And your sense is that he was basically yelling Biblical
22     representations?
23  A. It seemed like he was almost yelling at me and like he
24     was targeting me for something that I didn't know how to
25     explain it other than that.



Page 14

1  Q.  Did he seem to be yelling Bible references?
2  A.  Pretty much, yeah, straight from revelation.
3  Q.  He didn't make any threats or anything like that?
4  A.  No. No.
5  Q.  Did you hear him say he wanted to go party or anything
6      like that?
7  A.  No.
8  Q.  Did you hear him walking in the hallway?
9  A.  Not at all.
10 Q.  Did you hear him kick in a door in any way?
11 A.  No.
12 Q.  Did he ever come to your door during that period?
13 A.  He did come to my door, and he asked me if I had any of
14     the drug left, and I said not much but you can finish
15     it. There were probably two hits there, and I gave it
16     to him, and he finished it.
17 Q.  What was the drug?
18 A.  The bath salts.
19 Q.  Okay. At some point you went to bed that night?
20 A.  I went to bed right after that happened, and I locked my
21     door.
22 Q.  If he started yelling around 9:30 these Biblical quotes,
23     what time of night do you think you went to bed?
24 A.  He?
25 Q.  You.

Page 15

1  A.  Yeah, about 9:45, 10 o'clock.
2  Q.  And by the time you went to bed, was he still doing
3      these Biblical yelling quotes?
4  A.  Oh, yeah. Yes.
5  Q.  So you would have been awake while that was going on?
6  A.  Yeah. I'm deaf in the left ear.
7  Q.  You slept through whatever else happened that night?
8  A.  Hm-hmm.
9  Q.  Is that yes?
10 A.  Yes.
11 Q.  You had no further interactions with Phil McCue that
12     night at all?
13 A.  No.
14 Q.  You had no interaction with any police that night?
15 A.  No. It wasn't until the next morning. They came and
16     asked me -- they asked me these questions the next
17     morning, whether I had heard what went on or seen what
18     went on, and I denied it. I said, no.
19 Q.  And you heard after the fact that he had died?
20 A.  Yeah.
21 Q.  Do you know who you heard that from?
22 A.  I heard that from Jeff that morning, but I didn't
23     believe it, I doubted it, and then I heard it straight
24     from his brother, James, probably a week later.
25 Q.  James McCue?

Page 16

1  A.  Yeah.
2      MR. VAN DYKE: I have nothing further, thank you,
3  sir.
4      MR. RANDLETT: I just have a couple of quick
5  follow-up questions.
6           FURTHER EXAMINATION
7  BY MR. RANDLETT:
8  Q.  Correct me if I'm wrong -- I don't want to put words in
9      your mouth -- but did you say that at some point during
10     that night Mr. McCue asked you if you had any of the
11     drug left?
12 A.  Yeah. I gave him what I had.
13 Q.  Okay. And that was bath salts?
14 A.  Yeah.
15 Q.  Did you see whether or not he actually used those drugs?
16 A.  I saw him -- no, I didn't see him use them, but they had
17     already been melted on the foil.
18 Q.  At --
19 A.  I gave him what was left of what I was using, and he
20     brought it to his room.
21 Q.  Had you used any of those drugs that night?
22 A.  I used for four years straight, yes.
23 Q.  So were you under any --
24 A.  That was all I had used that night, that one bag.
25 Q.  Okay. Were you under the influence of bath salts on the

Page 17

1      night of September 12th?
2  A.  Yes.
3      MR. RANDLETT: That's all I have.
4      MR. VAN DYKE: Nothing further.
5      MR. RANDLETT: Mr. Cromwell, you have the right to
6  do what's called read and sign, which means once the
7  transcript is done, they can send it to you and you'll
8  have a period of 30 days to review it and see if there's
9  any inaccuracies that you want to change, and you can
10 make those changes.
11     You can do that if you want, or you can waive that,
12 which means that it will be finalized as of today. It's
13 up to you.
14     THE WITNESS: Yeah.
15     MR. RANDLETT: Which would you like to do?
16     THE WITNESS: I don't know. I guess it should just
17 be finalized when I say that I didn't use any of the
18 drug with him, we weren't using together, but we were
19 both using separately, individually.
20     MR. RANDLETT: Okay. And just so that we're clear
21 for the record, did you want to waive the right to read
22 and sign?
23     THE WITNESS: Yeah, I guess so.
24     MR. VAN DYKE: Very good. I have nothing further.
25     (The deposition was concluded at 2:07 p.m.)



MICHAEL MCCUE v. CITY OF BANGOR
CROMWELL, CHARLES on 09/26/2014

Page 18

CERTIFICATE

Page 18

I, Lisa Fitzgerald, a Notary Public in and for the State of Maine, hereby certify that on September 26, 2014, personally appeared before me CHARLES CROMWELL, the within-named deponent, who was sworn to testify to the truth, the whole truth, and nothing but the truth, in the cause of action MICHAEL MCCUE, individually and as Personal Representative of the Estate of Phillip McCue, Deceased v. CITY OF BANGOR, MAINE, et al., now pending in the UNITED STATES DISTRICT COURT, DISTRICT OF MAINE; and that this deposition was stenographically reported by me and later reduced to typewritten form with the aid of computer-aided transcription; and the foregoing is a full and true record of the testimony given by the witness.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

I further certify that the adverse party was duly notified according to law to attend at the taking of said deposition and did attend.

IN WITNESS WHEREOF, I subscribe my hand and affix my seal this October 3, 2014.

*Lisa Fitzgerald*
LISA FITZGERALD, NOTARY PUBLIC
Court Reporter

My commission expires: May 10, 2018

