**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                    FOR THE DISTRICT OF MAINE
 3
 4
 5   MICHAEL McCUE, personal        )
 6   representative of the estate   )
 7   of Phillip McCue, Deceased,    )
 8                                  )  Civil Action
 9              Plaintiff,          )  Case No. 1:14-cv-0098-GZS
10                                  )
11        vs.                       )
12                                  )
13   CITY OF BANGOR, MAINE, et al., )
14                                  )
15              Defendants.         )
16
17
18
19        DEPOSITION of JOHN YORK, taken pursuant to
20   Notice, at the offices of Richardson, Whitman, Large &
21   Badger, One Merchants Plaza, Bangor, Maine, beginning
22   at 2:30 p.m., December 12, 2014, before Rebecca M.
23   Pearson, a Notary Public in and for the State of
24   Maine.
25
```

(stamped: COPY)

**Page 2**

```
 1
 2   APPEARANCES:
 3   For the Plaintiff:      DAVID J. VAN DYKE, ESQ.
 4
 5   For the Defendants:     FREDERICK J. BADGER, JR., ESQ.
 6                           JOSHUA A. RANDLETT, ESQ.
```

**Page 3**

```
                            WITNESS INDEX
                                                         Page
     WITNESS:  JOHN YORK

        Examination by: Mr. Van Dyke          4


                         INDEX OF EXHIBITS

     (Exhibit No. 2 from David Rudolph's deposition was
     referred to.)
```

**Page 4**

1    (This deposition was taken before Rebecca
2    M. Pearson, RPR, a Notary Public for the state of
3    Maine, at the offices of Richardson, Whitman, Large &
4    Badger, One Merchants Plaza, Bangor, Maine, on
5    December 12, 2014, beginning at 2:30 p.m.)
6         (The deponent was administered the oath by
7    the Notary Public.)
8    **JOHN YORK**, having been duly sworn by the Notary Public,
9    was examined and deposed as follows:
10                         EXAMINATION
11   BY MR. VAN DYKE:
12   Q    Sir, you are John York?
13   A    Yeah.
14   Q    Have you ever been deposed before?
15   A    Yes.
16   Q    In a professional matter?
17   A    Yep.
18   Q    I assume that this will proceed exactly as that did.
19        I'll be asking you a series of verbal questions.
20        You'll be answering those questions under oath, and
21        everything you say and eve[ry]
22        taken down by the court rep[orter]
23        and not with shrugs of the [head or]
24        shoulders. Okay?
25   A    Okay.

EXHIBIT 12

**Page 9**

1  in other words, if I was sitting directly behind the
2  driver like this and I'm facing backwards, I can look
3  over my shoulder and see out through the windshield.
4  But you can't see completely, you know, without
5  turning around and all that.
6  Q  You were seated facing backwards, correct?
7  A  That's correct.
8  Q  As was Mr. Rudolph?
9  A  That's correct.
10 Q  And I'm assuming that you were directly behind the
11    driver?
12 A  I was behind the driver, yes.
13 Q  But you were facing the opposite direction from him?
14 A  Right.
15 Q  Okay. So how did you have occasion, if you're seated
16    backwards, to see police cars or an individual running
17    and police chasing him?
18 A  Well, just happened that I could see out the
19    windshield of the truck, and Cedar Street's right here
20    to the passenger side. (Indicating) So you have a
21    better vision point that way, and I was just able to
22    see a cruiser coming down the hill and another two
23    cruisers were parked, and there was a police officer
24    in pursuit of somebody.
25 Q  So by turning yourself, you could see out the window?

**Page 10**

1  A  Yeah.
2  Q  And that's, in fact, what you did?
3  A  Yeah.
4  Q  Okay.
5  A  Yes.
6  Q  That's fine. So tell me what happened after you saw
7     the police cruisers and then you saw an individual
8     running and a couple of police officers after him?
9  A  I believe they ran out into the middle of Main Street,
10    and one of the cruisers went over to act as a, for
11    better lack of terms, like a vehicle block so nobody
12    would get hurt.
13 Q  Okay.
14 A  But there was such a struggle going on on that
15    opposite side of Main Street from Central Firehouse,
16    that when the light turned green, I believe Acting
17    Lieutenant Hodge directed the driver to slide the
18    truck over and let's just block traffic for them and
19    stay in the truck while they're doing their thing.
20 Q  Now, while the confrontation was occurring with the
21    police officers and Mr. McCue, you were in the engine
22    that was parked essentially in the street, correct?
23 A  Yes.
24 Q  And the -- as I understand it from the prior testimony
25    of Mr. Rudolph, the truck had been parked in such a

**Page 11**

1  way to sort of block traffic from the area of the
2  confrontation?
3  A  Right.
4  Q  Would that be correct?
5  A  Yes.
6  Q  Now, were you, throughout the time that the truck was
7     parked, staying inside the truck?
8  A  Yes.
9  Q  Did you move around inside the truck, or did you stay
10    pretty much where you were seated?
11 A  Stayed pretty much in my seat. We were returning from
12    a call, and we were working on some equipment and
13    stuff to get that back in service.
14 Q  As I understand the situation, the engine itself was
15    parked in such a way that the front of the engine was
16    facing the river, correct?
17 A  Yes.
18 Q  So you would have been facing, as you were seated,
19    toward the Central Firehouse?
20 A  Well, yeah, I mean, I would have been able to see
21    Central from Dave's side -- from the passenger's side,
22    and I could see the Quirk lot from my side.
23 Q  Did you have an opportunity to observe what was going
24    on between the police and Mr. McCue?
25 A  Yeah. There was quite a struggle.

**Page 12**

1  Q  You actually were able to see that?
2  A  Mm-hmm.
3  Q  That's a yes?
4  A  Yes. Sorry.
5  Q  Were you doing something while that confrontation was
6     going on?
7  A  I was putting the equipment back together and every
8     once in a while we'd be over watching the struggle
9     seeing what was going on and getting our equipment
10    ready for the next call.
11 Q  So you had some equipment that had to be put back
12    together after the prior call, correct?
13 A  Yes.
14 Q  That had nothing do with Mr. McCue?
15 A  No.
16 Q  At some point did you observe Mr. McCue on the ground
17    being covered by police officers?
18 A  Yes.
19 Q  Were you able to observe at what point there was any
20    cessation of resistance?
21 A  Yeah. He -- Mr. McCue was flailing around on the
22    ground just super human strength. I mean, I don't
23    remember how many police officers were there, but --
24 Q  At some point did the resistance seem to cease?
25 A  Not at -- not for a while.

Page 13

| | | |
|---|---|---|
| 1 | Q | Right, but at some point did it? |
| 2 | A | Not, not until after he was handcuffed. |
| 3 | Q | Okay. But at some point he's handcuffed, and does |
| 4 | | resistance cease that you could see? |
| 5 | A | At some point. |
| 6 | Q | Okay. At the point that resistance ceased, what was |
| 7 | | happening? |
| 8 | A | The police or the officers were putting the individual |
| 9 | | in their cruiser. |
| 10 | Q | Okay. So you, you observed at some point resistance |
| 11 | | has ceased, and he, I take it, has been picked up from |
| 12 | | the ground? |
| 13 | A | Yes. |
| 14 | Q | Did you see him get picked up? |
| 15 | A | Yes. |
| 16 | Q | And did you see him carried from the -- where he had |
| 17 | | been on the ground to the vicinity of the police |
| 18 | | cruiser? |
| 19 | A | Yeah. He was like a fish out of water there, you |
| 20 | | know, always moving around. |
| 21 | Q | At what point did you see him taken to the police car? |
| 22 | | Did you actually see that happen? |
| 23 | A | Yes. |
| 24 | Q | So you saw him picked up? |
| 25 | A | Yeah, I believe -- and again, you know, it was a while |

Page 14

| | | |
|---|---|---|
| 1 | | ago, but I believe it was two or three of them picked |
| 2 | | him up, and they went to the police cruiser, opened |
| 3 | | the back door, started to put Mr. McCue in the back of |
| 4 | | the cruiser. He was still flopping. |
| 5 | Q | You saw that? |
| 6 | A | Yeah. |
| 7 | Q | You actually were able to observe that? |
| 8 | A | And then he just kind of what I thought either he had |
| 9 | | decided to calm down or something had happened so -- |
| 10 | Q | What happened when there was no further response from |
| 11 | | Mr. McCue at all, what happened then? |
| 12 | A | I believe one of the officers motioned to us that |
| 13 | | something was wrong. So at that point we felt the |
| 14 | | scene was safe and we exited the truck and -- |
| 15 | Q | Mr. Rudolph had talked about a knock on the window |
| 16 | | from Mr. Hodge and asking people to come out. |
| 17 | | Do you remember that? |
| 18 | A | I don't remember that because that would have been on |
| 19 | | a different side of the truck. |
| 20 | Q | So there was no knock on the window on your side of |
| 21 | | the truck? |
| 22 | A | No, because I was watching the event, if you will, |
| 23 | | unfold before me. |
| 24 | Q | And the opposite side of the truck could not watch the |
| 25 | | event because it was on the wrong side of the truck? |

Page 15

| | | |
|---|---|---|
| 1 | | MR. RANDLETT: Object to form. |
| 2 | A | They could have, but I don't know what everybody was |
| 3 | | doing. |
| 4 | | BY MR. VAN DYKE: |
| 5 | Q | Okay. Okay. So what happens when he is |
| 6 | | nonresponsive; what happens then? |
| 7 | A | We got out of the engine and it was right across from |
| 8 | | the station, so motioned over the ambulance. And the |
| 9 | | guys got in the truck, they came over. We went and |
| 10 | | examined Mr. McCue, and the ambulance backed up, got |
| 11 | | the stretcher out, put him on the stretcher, and I |
| 12 | | believe he wasn't breathing or something. He was |
| 13 | | unresponsive basically. |
| 14 | Q | There were -- were there any other EMTs or paramedics |
| 15 | | who responded before you guys got there? |
| 16 | A | No. |
| 17 | Q | So the first people to get to Mr. McCue were the ones |
| 18 | | who came from your fire truck? |
| 19 | A | Yes. |
| 20 | Q | And how many of you came over there? |
| 21 | A | Well, it was four of us so -- |
| 22 | Q | Okay. So the four of you from the fire truck were the |
| 23 | | first people to reach Mr. McCue? |
| 24 | A | Yes. After the police had arrested him. |
| 25 | Q | After the police arrested him, right? |

Page 16

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | Okay. Were there other EMTs or paramedics sort of |
| 3 | | milling around other than you four? |
| 4 | A | I don't recall milling around. The ambulance door was |
| 5 | | open, and they were right in front of the bumper of |
| 6 | | the ambulance, I think, if I remember right when it |
| 7 | | was time -- nobody was walking in the scene or |
| 8 | | anything like that. |
| 9 | Q | Okay. But there's no question that the four people |
| 10 | | who were most immediately upon Mr. McCue after he was |
| 11 | | nonresponsive of a medical nature were you four from |
| 12 | | the truck? |
| 13 | A | Yeah -- yes. |
| 14 | Q | Yes. And did you note right away that he was |
| 15 | | nonresponsive? |
| 16 | A | Yes. |
| 17 | Q | Was that you or someone else? |
| 18 | A | I can't remember if it was me or who it was, but as a |
| 19 | | team, we knew that something -- that the patient was |
| 20 | | unresponsive. |
| 21 | Q | Mr. Rudolph indicated that essentially all of you had |
| 22 | | the same level of training so you basically act |
| 23 | | collaboratively, right? |
| 24 | A | That night, yes. We had an abundance of paramedics |
| 25 | | that night. |

17

1  Q  Okay. So when he was nonresponsive, do you remember
2     what was done?
3  A  We -- I don't recall everything completely, but we
4     started rendering care. I know that much.
5  Q  When you came over to him, was he still handcuffed?
6  A  Yes.
7  Q  Was he still bound in his legs?
8  A  Yes.
9  Q  Were his bindings of his legs still attached to the
10    bindings on his arms?
11 A  I, I don't remember.
12 Q  What's commonly thought of as a hogtie?
13           MR. RANDLETT: Object to the form.
14 A  I don't remember.
15 BY MR. VAN DYKE:
16 Q  You don't know if he was still hogtied or not?
17 A  I don't remember.
18 Q  Okay. How was his body situated when you came over to
19    him?
20 A  I believe he was facedown.
21 Q  So the handcuffs would have been behind his back,
22    right?
23 A  Yes.
24 Q  So you would have easily seen the handcuffs?
25 A  Yes.

18

1  Q  All right. Were you able to initiate care before the
2     handcuffs were removed?
3  A  We -- everything was almost simultaneously. I mean,
4     the ambulance backed in. We grabbed a stretcher, put
5     him on the stretcher. At that time I believe the
6     police had removed -- the officers removed the
7     handcuffs for us so we could do our job, and then we
8     started rendering care.
9  Q  Do you know how long you were providing care at the
10    scene?
11 A  It wasn't very long at all. Had to be less than a
12    minute.
13 Q  So you think after a minute he was taken to the
14    ambulance?
15 A  I think we were on scene in the ambulance for less
16    than a minute.
17 Q  Let me show you a document that has been marked as
18    Exhibit No. 2 during Mr. Rudolph's deposition, and it
19    is a Patient Care Report relating to this incident.
20         Have you ever before in your life seen that
21    document, sir?
22 A  (Examining document) If it's the same EMS report that
23    I have here, then I would say yes.
24 Q  It should be, but go ahead and confirm it's the same
25    one.

19

1  A  (Examining documents) Yes.
2  Q  Okay. Now, can you tell me based on that report when
3     you four reached Mr. McCue?
4  A  No.
5  Q  I'll indicate that Mr. Rudolph felt that 9:06 would
6     have been the time that you had responded to Mr.
7     McCue.
8  A  That would have been what I would say, yes. You could
9     say that that was the time that we responded.
10 Q  Any reason why you wouldn't think that that was
11    accurate?
12 A  Only because I don't remember the times.
13 Q  Okay. But if you look at the document, you believe
14    the document's probably accurate?
15 A  Yes.
16 Q  Okay. So that seems to suggest that Mr. McCue was not
17    loaded onto the ambulance until 9:12, six minutes
18    later.
19 A  (Examining document) Again, I don't -- I'm not sure
20    what the --
21 Q  I'm only asking for your memory. You said you thought
22    it was a minute, and it appears to have been at least
23    six minutes.
24 A  Well, it may have been, but I know we were fairly
25    within ten minutes to the hospital, so that makes

20

1  almost sense. So 1206 (sic) to 1215 (sic) that's,
2  what, 11 minutes to the hospital. So that's pretty
3  quick in our terms, if you will.
4  Q  Okay. So could you have been working on him for six
5     minutes before he was loaded into the ambulance?
6  A  I suppose we could considering the times, but it just
7     seemed a lot quicker.
8  Q  So you think that document is probably more accurate
9     than your memory?
10 A  If that's what the times say, I would say yes.
11 Q  You never obtained a heartbeat from Mr. McCue while
12    you were working on him for six minutes, did you?
13 A  Not that I recall.
14 Q  And during the ride to EMMC, the heartbeat was not
15    resumed, was it?
16 A  I believe we did -- we did cardiac resuscitation the
17    whole time.
18 Q  And no heartbeat was induced?
19 A  As far as I know.
20 Q  In fact, according to that document, a heartbeat was
21    not induced until at approximately 9:18.
22       Do you see that?
23 A  (Examining document) Okay.
24 Q  Which would be 12 minutes after you had started
25    treating him, right?

```
                                              21
1   A   Correct, because we continued CPR the whole time.
2   Q   If a person is flat lined for 12 minutes, why continue
3       the CPR?
4   A   Because our protocol states that we do that for at
5       least 20 minutes.
6   Q   For at least 20 minutes?
7   A   And depending upon the situation, longer. By that
8       time we were at the hospital, so probably our
9       equipment was still on the patient at the hospital.
10  Q   Were you present with Mr. McCue when a heartbeat was
11      resumed?
12  A   I do not know that. I don't remember that.
13  Q   So you don't remember if a heartbeat was ever resumed
14      while you were with him?
15  A   I don't.
16  Q   Did someone make a determination on the scene that he
17      had suffered a cardiac arrest?
18  A   The determination would have been just based on the
19      fact that he had no pulse, and we were doing CPR. So
20      some type of a heart event had definitely happened.
21  Q   Did anyone make a determination what had caused that
22      event?
23  A   No.
24  Q   Have you had experience dealing with individuals who
25      have experienced excited delirium?
```

```
                                              22
1   A   I've had experience with patients that have been
2       excited, yes.
3   Q   Well, I'm talking about specifically excited delirium.
4         Do you know what that term means?
5   A   I do not.
6   Q   That's not a term you use professionally?
7   A   That's correct.
8   Q   So you would not be able to tell me sort of
9       professionally if Mr. McCue was exhibiting symptoms of
10      excited delirium that night or not?
11  A   I would not be able to tell you what that term means.
12  Q   Okay. There are lots of events that can lead to a
13      cardiac arrest, correct?
14  A   Sure.
15  Q   Were you able to observe Mr. McCue when he was on the
16      ground with the officers on him?
17  A   Observe him in what way?
18  Q   Could you observe his body while the officers were on
19      him?
20  A   Yeah -- yes.
21  Q   Would you agree -- would you agree that there were
22      officers who were placing weight on his upper back?
23          MR. RANDLETT: Object to the form.
24  A   I would have no way to know that. Alls I -- yeah, I,
25      I would have no way to know where they were placed,
```

```
                                              23
1       you know. There was a lot of people on him, but I
2       would have no way to know.
3   Q   There were a lot of people on him, but you don't know
4       where their weight was?
5   A   No.
6           MR. VAN DYKE: I have nothing further.
7       Thank you, sir.
8           MR. RANDLETT: We don't have any questions
9       for Mr. York. He will read and sign.
10          (The deposition concluded at 2:54 p.m.)
```

```
                                              24
1                       CERTIFICATE
2         I, Rebecca M. Pearson, RPR, a Notary Public in
3   and for the State of Maine, hereby certify that on the
4   12th day of December, 2014, personally appeared before
5   me at the offices of Richardson, Whitman, Large &
6   Badger, One Merchants Plaza, Bangor, Maine, the
7   within-named deponent, JOHN YORK, who was sworn to
8   testify the truth, the whole truth, and nothing but
9   the truth in the cause of action MICHAEL McCUE v. CITY
10  OF BANGOR, MAINE, et al.
11        I further certify that this deposition was
12  stenographically reported by me and later reduced to
13  computerized transcription, and that the foregoing is
14  a full and true record of the testimony given by the
15  deponent.
16        I further certify that I am a disinterested
17  person in the event or outcome of the above-named
18  cause of action.
19        IN WITNESS WHEREOF, I subscribe my hand this 27th
20  day of December, 2014.

                               _____
                               Rebecca M. Pearson, RPR
                               Notary Public
24  My commission expires:
25  February 22, 2016
```