Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MICHAEL McCUE, personal )
representative of the estate )
of Phillip McCue, Deceased, )
) Civil Action
Plaintiff, ) Case No. 1:14-cv-0098-GZS
)
vs. )
)
CITY OF BANGOR, MAINE, et al., )
)
Defendants. )

DEPOSITION of DAVID RUDOLPH, taken pursuant to Notice, at the offices of Richardson, Whitman, Large & Badger, One Merchants Plaza, Bangor, Maine, beginning at 12:07 p.m., December 11, 2014, before Rebecca M. Pearson, a Notary Public in and for the State of Maine.

Page 2

APPEARANCES:

For the Plaintiff: DAVID J. VAN DYKE, ESQ.

For the Defendants: FREDERICK J. BADGER, JR., ESQ.
JOSHUA A. RANDLETT, ESQ.

Page 3

WITNESS INDEX

WITNESS: DAVID RUDOLPH                           Page

Examination by: Mr. Van Dyke                     4  50
                Mr. Badger                       48

INDEX OF EXHIBITS*

No.  Description                                 Marked

1    Bangor Police Department investigative
     narrative report prepared by Detective
     Erik Tall dated 9/12/12 interview of
     Mr. Rudolph.                                11

2    Patient Care Report from the Bangor
     Fire Department, Incident No. 1953619,
     re Phillip McCue                            11

3    Incident Report No. 2012-1953619            11

*Exhibits 1 through 3 retained by Attorney Van Dyke.

Page 4

1  (This deposition was taken before Rebecca
2  M. Pearson, RPR, a Notary Public for the state of
3  Maine, at the offices of Richardson, Whitman, Large &
4  Badger, One Merchants Plaza, Bangor, Maine, on
5  December 11, 2014, beginning at 12:07 p.m.)
6     (The deponent was administered the oath by
7  the Notary Public.)
8  **DAVID RUDOLPH**, having been duly sworn by the Notary
9  Public, was examined and deposed as follows:
10                    EXAMINATION
11 BY MR. VAN DYKE:
12 Q   Sir, you are David Rudolph, correct?
13 A   I am.
14 Q   And you spell your last name R U D O L P H, correct?
15 A   Correct.
16 Q   You are here today pursuant to a notice of your
17     deposition.
18        Are you aware of that?
19 A   I am.
20 Q   Have you ever had your deposition taken before?
21 A   I have not.
22 Q   I'm sure that you were tol[d by]
23     Attorney Badger, but esse[ntially]
24     fairly brief verbal question[s]
25     you're going to be under o[ath]

EXHIBIT 13

**Page 13**

1  day in the morning.
2  Q  7:55 a.m. --
3  A  Correct.
4  Q  -- on the 12th until 7:55 a.m. --
5  A  A.m. on the 13th.
6  Q  -- on the 13th?
7  A  Correct.
8  Q  And was that a common shift?
9  A  It is a regular shift, yeah.
10 Q  How many of those shifts do you normally work a week?
11 A  Approximately to a week.
12 Q  Were you assigned to any particular location that day?
13 A  I was.
14 Q  What location?
15 A  For the day shift or the night shift?
16 Q  Good point. Is that 24-hour shift divided into two
17    portions?
18 A  It is. There's a ten-hour day shift and 14-hour night
19    shift.
20 Q  I'm assuming that the events that bring us here today
21    occurred during the night shift?
22 A  They did.
23 Q  Tell me, where were you assigned for the day shift?
24 A  For the day shift I believe I was on Engine No. 1 --
25    excuse me -- Ladder No. 1.

**Page 14**

1  Q  Where is that located?
2  A  That's located at Central Station.
3  Q  On Main Street?
4  A  Correct.
5  Q  And where were you assigned for the night shift?
6  A  I'd done a mutual swap and was assigned to Engine No.
7     1.
8  Q  Where was that?
9  A  At Central Station.
10 Q  So you were assigned to different engines, but at the
11    same location?
12 A  Correct, yeah.
13 Q  So you never physically had to move?
14 A  I did not, no.
15 Q  Just the engine you would have ridden on was changed,
16    correct?
17 A  Correct, yeah.
18 Q  Okay. What was the first that you had any knowledge
19    or understanding of any kind whatsoever regarding
20    either Mr. McCue or the events of that evening that
21    resulted later in his death?
22 A  We were riding in Engine 1 returning from another
23    call. We are returning to Central Station.
24 Q  Who would have been in that engine with you?
25 A  Would have been myself, Driver/Operator Ron Green,

**Page 15**

1  Firefighter/Paramedic John York and Fighter/Paramedic
2  Greg Hodge. Greg Hodge was the acting officer that
3  evening.
4  Q  So he would have been the superior officer?
5  A  Correct. He was the acting lieutenant.
6  Q  Do you know where you were coming from in this engine?
7  A  We were coming from Willow Street.
8  Q  I don't know where Willow Street is in Bangor. Tell
9     me where that is in relation to the Central Fire
10    Station.
11 A  It is off Center Street.
12 Q  So you would be traveling southbound toward the
13    casino?
14 A  Correct.
15 Q  With the intention of pulling into the Central
16    Station?
17 A  Correct.
18 Q  What did you observe?
19 A  At which moment?
20 Q  The first time you had any understanding that there
21    was anything to do with Mr. McCue or the events of
22    that evening.
23 A  Certainly. As indicated in my report to Detective
24    Tall, we were returning to Central Fire coming down
25    Main Street. We were stopped at the traffic light at

**Page 16**

1  the interaction of Main and Cedar Street.
2  Q  Right in front of the homeless shelter?
3  A  Correct. Waiting for the light to turn when I --
4  Q  Let me just cut you off, and I don't mean to be rude.
5     Where in the fire truck would you have been
6     seated?
7  A  I was behind the passenger. So I was --
8     essentially our seats are back to back in the fire
9     engine. So I was on the passenger side facing
10    rearward.
11 Q  Facing backward?
12 A  Correct.
13 Q  Do you have a window or some other means by which you
14    can look out when you're seated there?
15 A  Yeah. There's a side window, as well as -- well, I
16    can turn and look through the windshield itself.
17 Q  Okay. What's the first that you had any indication
18    that there was anything to do with Mr. McCue or the
19    events of that evening?
20 A  Certainly. While pulling up to that intersection, I
21    noticed a police cruiser coming down Cedar Street and
22    turned and looked through the windshield, saw another
23    police cruiser. I believe (examining document) coming
24    up Main Street and witnessed an individual walking in
25    front of Central Fire Station.

**17**

1  Q  Was that the individual who turned out to be Mr.
2     McCue?
3  A  I believe so.
4  Q  You say he was walking in front of the Central Fire
5     Station?
6  A  To my knowledge.
7  Q  Was he walking in a northerly direction toward
8     downtown or a southerly direction toward the casino?
9  A  I don't recall.
10 Q  Was he on the sidewalk, or was he in the street?
11 A  I don't recall that either.
12 Q  Do you recall anything that you observed regarding his
13    presentation?
14 A  It was dark. Couldn't really see much as far as his
15    appearance or mannerisms or anything like that.
16 Q  What did you then observe?
17 A  I observed that individual crossing the street.
18 Q  That's Main Street?
19 A  Correct, yeah. So crossing essentially from the front
20    portion of Central Fire Station across the street kind
21    of towards the vacant lot that sits kind of next to
22    the -- next to the sidewalk there.
23 Q  So he was walking across the street toward the river?
24 A  Correct, yeah.
25 Q  You actually saw him do that?

**18**

1  A  I did.
2  Q  And what did you then see?
3  A  I then saw him end up on the ground at some point.
4  Q  Did you see how he ended up on the ground?
5  A  I did not. There was a police officer behind him at
6     that point who had stopped, but as far as what manner
7     they used to get him onto the ground, I don't recall.
8  Q  For example, did you see him trip or did you see him
9     be taken down?
10 A  I did not, no.
11 Q  You didn't see either way?
12 A  No. I just -- I can't recall.
13 Q  Okay.
14 A  All I know is that at some point while he was walking,
15    whether he tripped or whether it was by some other
16    means, I can't say specifically.
17 Q  All right. What did you then observe?
18 A  I then -- we pulled the engine up past the scene, and
19    I say we, the driver/operator pulled the engine up
20    past the scene to block traffic while, while the
21    Police Department worked and did their jobs. And at
22    that point because of the nature of the way the fire
23    engine was blocking, I didn't see much, much else
24    following that.
25 Q  So you were -- throughout the ensuing confrontation

**19**

1     between Mr. McCue and police officers, you were inside
2     the engine?
3  A  I was and we were actually preparing and putting our
4     equipment back together from the previous call that we
5     had just come from on Willow Street.
6  Q  So during this time while the confrontation is going
7     on between the police officers and Mr. McCue, you
8     can't see anything of that?
9  A  I could not, no.
10 Q  And you were doing something that was totally
11    unrelated?
12 A  I was, yes.
13 Q  And your other crew members were also doing something
14    totally unrelated?
15 A  I cannot say as to what their -- as to what they were
16    doing.
17 Q  Did they appear to be talking among themselves about
18    what was happening with Mr. McCue or not?
19 A  No, I can't recall, no.
20 Q  Do you recall seeing any of the confrontation at all?
21 A  I do not.
22 Q  But for the events with Mr. McCue, the fire engine
23    would normally have been pulled into the Central Fire
24    Station, correct?
25 A  Correct.

**20**

1  Q  Did you have an understanding as to why the fire
2     engine had been stopped in the middle of the street?
3  A  I did, yes.
4  Q  Did someone say something?
5  A  Yes. The acting lieutenant instructed the driver to
6     go ahead and pull and block traffic as we did as he
7     said that he observed traffic coming down Main Street.
8  Q  That was Mr. Hodge?
9  A  Correct.
10 Q  Okay. So I take it that a period of time passes while
11    you are still inside the engine taking care of
12    equipment from the prior call?
13 A  It did, yeah.
14 Q  And at some point did that change?
15 A  Yes.
16 Q  What happened?
17 A  I -- Acting Lieutenant Hodge came to my window, which
18    was partially down, and said the -- we need to go
19    evaluate this guy.
20 Q  Do you have any sense of how long you were in the
21    engine between the time it had pulled out into the
22    street --
23 A  Mm-hmm.
24 Q  -- and the time when Mr. Hodge had knocked on your
25    window to tell you to come out and conduct an

21

| | | |
|---|---|---|
| 1 | | evaluation. |
| 2 | A | I do not. |
| 3 | Q | Would I be correct in assuming that could be measured |
| 4 | | in minutes? |
| 5 | A | I don't recall. |
| 6 | Q | During the period of the interlude while you are in |
| 7 | | the engine attending to other business -- |
| 8 | A | Certainly. |
| 9 | Q | -- what were your other three firemen doing? |
| 10 | A | I don't recall specifically what they were doing. |
| 11 | | Like I said, I was -- I was focused on putting the |
| 12 | | equipment back together.  We had just worked another |
| 13 | | cardiac arrest just prior to that so -- |
| 14 | Q | Did all three of the other gentlemen stay in the |
| 15 | | engine? |
| 16 | A | I don't believe so. |
| 17 | Q | Do you know where any of them went? |
| 18 | A | I believe Lieutenant Hodge got out just to direct |
| 19 | | traffic around the engine. |
| 20 | Q | Did the other two stay in, to the best of your |
| 21 | | recollection? |
| 22 | A | I don't recall specifically but -- |
| 23 | Q | Now, in the group of four of you, how many were |
| 24 | | paramedics? |
| 25 | A | There were three paramedics. |

22

| | | |
|---|---|---|
| 1 | Q | And who were those paramedics? |
| 2 | A | John York, myself and Greg Hodge. |
| 3 | Q | So the driver/operator was not a paramedic? |
| 4 | A | I believe he's an EMT. |
| 5 | Q | So Mr. Hodge, who had been outside directing traffic, |
| 6 | | comes over, knocks on your window. |
| 7 | A | Yes, sir. |
| 8 | Q | And tells you that you should come out and evaluate |
| 9 | | the individual? |
| 10 | A | Correct. |
| 11 | Q | Did he direct this to you in particular or to the |
| 12 | | three of you? |
| 13 | A | To the engine company. |
| 14 | Q | Any one of the three of you? |
| 15 | A | Yeah.  We were all, all right there in the same cab, I |
| 16 | | believe, so -- |
| 17 | Q | Who came out at that point? |
| 18 | A | Who stepped out of the engine? |
| 19 | Q | Right. |
| 20 | A | Myself, and like I said, I don't recall whether the |
| 21 | | others were in or out, but when I came around the back |
| 22 | | of the engine, the entire engine company was there. |
| 23 | Q | So by the time you got out of the engine, all of you |
| 24 | | had come out of the engine? |
| 25 | A | Correct. |

23

| | | |
|---|---|---|
| 1 | Q | And what did you do? |
| 2 | A | We approached the patient.  Acting Lieutenant Hodge |
| 3 | | had indicated to me that he believed the patient was |
| 4 | | unresponsive.  We approached the patient and assessed |
| 5 | | and evaluated his current condition. |
| 6 | Q | Were the four of you from the fire engine the first |
| 7 | | people of a paramedic or EMT nature to reach Mr. |
| 8 | | McCue? |
| 9 | A | I believe we were. |
| 10 | Q | Now, I will represent to you, sir, that there was a |
| 11 | | video taken from a car cam from police cruiser No. |
| 12 | | 22 -- |
| 13 | A | Okay. |
| 14 | Q | -- which shows firemen coming out of the engine |
| 15 | | walking toward Mr. McCue putting gloves on. |
| 16 | A | Okay. |
| 17 | Q | Do you recall doing that? |
| 18 | A | Putting on body substance isolation is common practice |
| 19 | | so -- |
| 20 | Q | I actually think I saw you doing that so -- |
| 21 | A | Okay.  So sure. |
| 22 | Q | So you would have walked out of the engine toward Mr. |
| 23 | | McCue? |
| 24 | A | Certainly. |
| 25 | Q | And you believe that the four of you roughly got to |

24

| | | |
|---|---|---|
| 1 | | him about the same time? |
| 2 | A | Yes. |
| 3 | Q | And the four of you were the first people to get to |
| 4 | | him? |
| 5 | A | We were. |
| 6 | Q | Was any one of you in charge once the medical aspect |
| 7 | | began? |
| 8 | A | As far as at that point, it's tough to indicate |
| 9 | | whether there's one specific leader.  Like I said, |
| 10 | | there's three of us that all have the same license |
| 11 | | level.  We all have a pretty good understanding of |
| 12 | | where a specific call is going.  So we all -- we all |
| 13 | | fulfill the tasks that need to be done. |
| 14 | Q | It was more or less a cooperative effort? |
| 15 | A | Correct. |
| 16 | Q | So it wasn't that someone said this is your case, |
| 17 | | David, as opposed to this is your case, John York, or |
| 18 | | something? |
| 19 | A | Right, yeah.  Yes. |
| 20 | Q | So when you walked up to Mr. McCue, what did you -- |
| 21 | | what did you observe? |
| 22 | A | Excuse me while I refer back to just refresh my |
| 23 | | memory. |
| 24 | Q | Feel free to utilize Exhibit 1 if necessary to refresh |
| 25 | | your recollection. |

|  |  | 29 |
|---|---|---|
| 1 |  | his leg restraints? |
| 2 | A | As I indicated earlier, I don't -- I don't recall. |
| 3 | Q | So someone requested that the handcuffs be removed? |
| 4 | A | Yes, sir. |
| 5 | Q | And that was done? |
| 6 | A | Yes, sir. |
| 7 | Q | Do you know which officer removed the handcuffs? |
| 8 | A | I do not. |
| 9 | Q | Once the handcuffs were removed, what happened? |
| 10 | A | We replaced the patient on a stretcher, and on |
| 11 |  | verification of pulselessness and apnea were |
| 12 |  | confirmed, we began chest compressions. |
| 13 | Q | Was he placed facedown or face up into the stretcher? |
| 14 | A | At that point he would have been in a supine position |
| 15 |  | on his back. |
| 16 | Q | Supine being the opposite of pronate? |
| 17 | A | Correct. |
| 18 | Q | He was nonresponsive? |
| 19 | A | He was. |
| 20 | Q | Could you tell from his condition what manner of cause |
| 21 |  | had caused him to be nonresponsive? |
| 22 | A | I do not, no. |
| 23 | Q | Did anyone make any type of diagnosis at that point? |
| 24 | A | Just initial cardiac arrest. |
| 25 | Q | But cardiac arrest can be caused by many things? |

|  |  | 30 |
|---|---|---|
| 1 | A | It can be, correct. |
| 2 | Q | Did you have any sense of what had caused the cardiac |
| 3 |  | arrest? |
| 4 | A | I do not. |
| 5 | Q | For example, hyperacidosis, hypermetabolic problems, |
| 6 |  | asphyxia, anything of that nature? |
| 7 | A | There's a plethora of causes to cardiac arrest. |
| 8 | Q | I understand. |
| 9 | A | Without having machines and diagnostic tools right |
| 10 |  | there, simply we saw the problem that we had a |
| 11 |  | pulseless and apneic patient, and we administered CPR |
| 12 |  | following our Maine state protocol. |
| 13 | Q | And apneic, when you say apneic, you're referring |
| 14 |  | to -- |
| 15 | A | Nonbreathing. |
| 16 | Q | Right. Now, you knew there had been a confrontation |
| 17 |  | between Mr. McCue and some police officers? |
| 18 | A | I -- like I said, I didn't witness it specifically |
| 19 |  | myself. |
| 20 | Q | Did any of the officers tell you what they had |
| 21 |  | observed or done with regard to Mr. McCue in the |
| 22 |  | ensuing -- in the prior minutes before they called you |
| 23 |  | over? |
| 24 | A | Not that I recall. |
| 25 | Q | Give you guidance what might have been the problem? |

|  |  | 31 |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Do you recall you or one of your fellow engine mates |
| 3 |  | asking for that kind of information? |
| 4 | A | I do not. |
| 5 | Q | Would that -- would that kind of information have been |
| 6 |  | helpful to you in what you had to do? |
| 7 | A | I mean, we were presented with a patient with certain |
| 8 |  | symptoms, and we're trained to treat those symptoms as |
| 9 |  | we see them so -- |
| 10 | Q | So at that moment it didn't really matter what had |
| 11 |  | caused him to become subject to cardiac arrest? |
| 12 | A | As far as our patient care, no. |
| 13 | Q | Now, I understand from my own research that there is a |
| 14 |  | protocol that must be followed when confronted with a |
| 15 |  | person who was, for example, not breathing. |
| 16 | A | Correct. |
| 17 | Q | And it's actually defined in Maine state law? |
| 18 | A | Okay. If you say so. |
| 19 | Q | Well, there are Maine standards? |
| 20 | A | There are Maine state EMS protocols. |
| 21 | Q | Correct. What does the protocol require when |
| 22 |  | confronted with an individual who is not responsive |
| 23 |  | and not breathing? |
| 24 | A | Initiation of CPR. |
| 25 | Q | And that was done immediately? |

|  |  | 32 |
|---|---|---|
| 1 | A | It was when we arrived. |
| 2 | Q | Who initiated the CPR on Mr. McCue? |
| 3 | A | I can't recall who as far as what specific tasks were |
| 4 |  | doled out. I can't -- I can't recall that. |
| 5 | Q | The CPR was not successful in reviving Mr. McCue, was |
| 6 |  | it, at the scene? |
| 7 | A | At the scene? |
| 8 | Q | Right. |
| 9 | A | It's a progressive process. |
| 10 | Q | A heartbeat or pulse was not resumed at the scene? |
| 11 | A | At the scene, no. |
| 12 | Q | I'd like to just have you educate me -- |
| 13 | A | Certainly. |
| 14 | Q | -- with regard to some of the content of Exhibits 2 |
| 15 |  | and Exhibits 3. |
| 16 | A | Okay. |
| 17 | Q | And I'll represent to you, sir, I saw Exhibit 2 a |
| 18 |  | couple years ago. |
| 19 | A | Okay. Certainly. |
| 20 | Q | So I'm well familiar with Exhibit 2. |
| 21 | A | Yeah. |
| 22 | Q | I'd like to call your attention to page 3 of |
| 23 |  | Exhibit No. 2. |
| 24 | A | Okay. (Examining document) |
| 25 | Q | That has an Assessment Intervention Table. |

**Page 41**

1  A   Certainly. That just means that while we were
2      continuing to perform chest compressions, patient's
3      cardiac rhythm did not change. And the administration
4      of the 1 milligram of epi en route and continued CPR
5      follows our Maine state protocols for management of an
6      asystolic patient.
7  Q   Did you travel to the hospital with the ambulance
8      staff and with Mr. McCue?
9  A   I did.
10 Q   How many of your four engine mates of the four of you
11     together traveled in the ambulance?
12 A   I believe as far as the engine personnel goes was
13     myself and Mr. York, and Mr. Hodge drove the ambulance
14     that night, I believe, to the hospital.
15 Q   So there would have been three of the four of you were
16     in the ambulance, and there was also an ambulance
17     person?
18 A   There was two ambulance personnel.
19 Q   Two ambulance personnel.
20 A   Yeah.
21 Q   And while the three-minute trip to Eastern Maine
22     Medical Center was occurring, you folks were
23     continuing to attempt to provide CPR as per the
24     protocol?
25 A   We were, yes.

**Page 42**

1  Q   You were not able to induce any heart rhythm until you
2      got to the hospital?
3  A   Until -- yes.
4  Q   That's what that line means?
5  A   Correct.
6  Q   You gave epinephrine on two occasions at 9:11 and
7      9:13:30?
8  A   Correct.
9  Q   Now, the narrative indicates that the ambulance
10     arrived at the hospital at 9:15, according to the
11     second page of the exhibit.
12 A   (Examining document) Okay.
13 Q   So the last or the second epinephrine shot would have
14     been 30 seconds before that approximately?
15 A   According to the -- yes.
16 Q   Still, still in the ambulance?
17 A   Correct.
18 Q   And then vitals were taken again three-and-a-half
19     minutes after he arrived at the hospital at 1830,
20     correct?
21 A   According to the document, yes.
22 Q   Right. So this document would have continued to carry
23     forth in the care even after he left in the ambulance?
24 A   Only, only because of the nature of the change in
25     cardiac rhythm upon transfer of care at the hospital.

**Page 43**

1  Q   What do you mean by that?
2  A   So normally the document would end on transfer of
3      care, but at some point during that, we noticed,
4      according to the document at 2118, that the pulse
5      returned. And that was during the transition of
6      patient care between ambulance personnel and staff at
7      the hospital.
8  Q   So was the heartbeat that was induced obtained while
9      he was still in the ambulance or at the hospital?
10 A   According to the document, it looks like it was at the
11     hospital during transition of patient care, because we
12     have to move the patient from our stretcher obviously
13     on to a hospital stretcher at that point, and change
14     over all of our equipment over to the hospital staff's
15     equipment so --
16 Q   Once he arrived at the ER at EMMC --
17 A   Mm-hmm.
18 Q   -- your role, I would assume, ends?
19 A   Yeah.
20 Q   Because there's staff at the hospital that can do what
21     you do?
22 A   There is, yes.
23 Q   Did you have any continuing role after the arrival of
24     Mr. McCue at the hospital?
25 A   Not that I recall.

**Page 44**

1  Q   And normally you would just say here he is and then
2      you'd be done?
3  A   Yeah. I mean, we would transfer patient care which
4      includes a brief explanation, essentially similar to
5      the narrative that's written here, interventions that
6      we performed. We would assist registration in
7      identifying name, date of birth, stuff like that. We
8      would have the hospital staff sign a sheet of paper,
9      and we would receive a demographic sheet for billing
10     purposes, and then we would put our apparatus back
11     together.
12 Q   And as far as you know, that's what happened in this
13     case?
14 A   I can't recall specifically, but I would assume so.
15 Q   Who is Jeffrey Brown?
16 A   Jeffrey Brown is the individual who was originally
17     assigned to Engine 1 for that day shift, and he and I
18     had the mutual swap for the evening.
19 Q   So if a record indicates Jeffrey Brown, that's just a
20     clerical error that failed to recognize --
21 A   Yeah. They just didn't change it over on that evening
22     in the computer system.
23 Q   Do you have any way of knowing how long Mr. McCue had
24     been asystole before you arrived to him?
25 A   I do not.

**Page 49**

1  section in the -- roughly in the middle, it says
2  person involved, Bruce D. Oaks. We know the person
3  we've been talking about is Phillip McCue.
4      And why does this Exhibit 3 reference Bruce Oaks?
5  A  To my knowledge that would be the complainant of the
6  incident, the original incident. Whatever --
7  Q  The person who would have called into the Police
8  Department --
9  A  Correct.
10 Q  -- or dispatch?
11 A  Yeah.
12 Q  All right.
13 A  Indicating some sort of problem.
14 Q  Okay. At the top of Exhibit, 3 there -- it says alarm
15 date and time 2106.
16    Is that the time that the Fire Department gets
17 the call to respond?
18 A  So those times would match up with those of Exhibit 2,
19 I believe, as far as when, whenever dispatch updates
20 that information.
21 Q  Okay.
22 A  I can't speak to their -- dispatch's process of time
23 stamping things.
24 Q  Okay.
25 A  They would have a radio recording of that stuff.

**Page 50**

1  Q  The next time down says arrival time 2106:18, would
2  that be 18 seconds that elapsed between alarm date and
3  time and arrival time; is that how you read that?
4  A  Which -- (examining documents) Yes, yeah.
5     MR. BADGER: I think that's all I have, too.
6            EXAMINATION
7  BY MR. VAN DYKE:
8  Q  Just out of curiosity, is there a central dispatch for
9  both fire and police?
10 A  There is.
11 Q  A single dispatch?
12 A  Correct. They're all employees of the Police
13 Department, but they have designated fire dispatchers
14 and designated police dispatchers. They're
15 interchangeable. They work, you know, kind of in a
16 rotation over there, but the Fire Department has
17 specific dispatchers for that 24-hour shift or
18 whatever their operating period is, and then the
19 Police Department has their designated dispatchers.
20 Q  The times should align though?
21 A  As far as?
22 Q  A police record and a fire record of a dispatched call
23 should have the same times for the same call?
24 A  Like I said, there's two separate dispatchers, one
25 dealing with the fire side and one dealing with the

**Page 51**

1  police side. And as to their responsibility as to
2  when things are clicked and entered into the computer
3  system, that I have no knowledge of so --
4  Q  Okay. You've answered my question.
5     MR. VAN DYKE: Thank you very much, sir.
6     (The deposition concluded at 1:05 p.m.)

**Page 52**

              CERTIFICATE
    I, Rebecca M. Pearson, RPR, a Notary Public in
and for the State of Maine, hereby certify that on the
11th day of December, 2014, personally appeared before
me at the offices of Richardson, Whitman, Large &
Badger, One Merchants Plaza, Bangor, Maine, the
within-named deponent, DAVID RUDOLPH, who was sworn to
testify the truth, the whole truth, and nothing but
the truth in the cause of action MICHAEL McCUE v. CITY
OF BANGOR, MAINE, et al.
    I further certify that this deposition was
stenographically reported by me and later reduced to
computerized transcription, and that the foregoing is
a full and true record of the testimony given by the
deponent.
    I further certify that I am a disinterested
person in the event or outcome of the above-named
cause of action.
    IN WITNESS WHEREOF, I subscribe my hand this 27th
day of December, 2014.

                        *Rebecca M. Pearson*
                        Rebecca M. Pearson, RPR
                        Notary Public
My commission expires:
February 22, 2016