IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **MICHAEL MCCUE, personal representative** ) <br> **of the estate of Phillip McCue, Deceased** ) <br> ) <br> **Plaintiff** ) <br> ) <br> **V.** ) <br> ) <br> **CITY OF BANGOR, MAINE** *et als.* ) <br> ) <br> **Defendants** ) | Civil Action <br> Case No. 1:14-cv-00098-GZS |

**PLAINTIFF'S MOTION TO**
**PERMIT/NOTICE OF INTENT TO USE EXPERT TESTIMONY IN CONTEXT OF**
**HIS OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT/QUALIFIED IMMUNITY**
**[PURSUANT TO DOCKET NO. 73]**

Plaintiff Michael McCue, Personal Representative of the Estate of Phillip McCue, Deceased [hereinafter, "the Decedent" or "McCue"], by and through his undersigned attorneys, hereby moves, pursuant to Docket No. 73, for expert discovery/inclusion of expert testimony in response to Defendants' motion for summary judgment/qualified immunity [Docket No. 83, henceforth, "Defendants' Motion"].

For the reasons discussed below, expert testimony is necessary for the full and fair consideration of the Motion.

## **GENERAL FACTUAL AND**
## **ARGUMENT BACKGROUND**

In its response to Defendants' motion for summary judgment/qualified immunity, Plaintiff McCue shall demonstrate that the decedent was healthy and vibrant prior to his interactions with police on the night of September 12, 2012, but died during and as a result of that interaction[1].

---

[1] It is respectfully submitted that the evidence produced to date in this matter establishes the following chronology:

On the evening of September 12, 2012, after approximately 8:30 p.m., McCue was loudly conversing and/or screaming and/or loudly reciting biblical passages (depending on the witness) in his apartment and/or in the hallway outside his apartment on the third floor of 18 First Street, Bangor, Maine. A call was placed by a second-floor tenant to the police, complaining of a "noise problem". Defendant Officer Kimberly Donnell responded to that noise complaint. When she arrived at 18 First Street, she heard some yelling on the third floor. She heard a large crash or thump, and saw the Decedent run by her on the second floor hallway, throwing a beer bottle down. McCue ran out the back door of 18 First Street down First Street in the direction of Cedar Street.

Officer Donnell requested backup. Defendant Officer Betters arrived almost immediately. Officer Betters picked up Officer Donnell walking southbound on First Street. Officer Donnell had seen the Decedent running in that direction. Officer Betters briefly saw the McCue running through Davenport Park at the corner of Cedar and Main Street, towards Main Street. Officer Betters (with Officer Donnell in his cruiser) drove down to Main Street and there briefly confronted the Decedent. McCue was spoken to through the window of the Betters' cruiser. McCue was given a disorderly warning and told to stay out of the roads. Officer Betters did not acknowledge or understand what replies was received. Officers Donnell and Betters then returned to 18 First Street. After a few minutes at 18 First Street, Officers Donnell and Betters were standing on the porch when Officer Betters observed McCue walking up First Street back towards 18 First Street. Officer Betters observed the Decedent cross First Street away from 18 First Street (so that the officers were on the other side of the road from him) and then commence running north on First Street, (away from Cedar Street) towards Union Street. Officer Betters subsequently heard a radio call announcing that the Decedent was then sighted on Main Street. In the meanwhile, non-party Officer Ryan Jones (who was responding to Officer Donnell's initial call) found himself driving up First Street toward 18 First Street and observed McCue *back* down First Street towards Cedar Street. Officer Jones observed the Decedent run by his vehicle to the south. Officer Jones reversed his then direction and gave chase. Shortly thereafter, Officer Jones observed McCue on Main Street. Officer Jones then lost contact with Mr. McCue when a fire truck from the Bangor Central Fire Station on Main Street pulled out onto Main Street, blocking his view. The balance of the events of the evening involving the Decedent, culminating in his death, are as captured by the Car 22 video.

According to the testimony of fire fighter David Rudolph, the paramedic who first responded to McCue (as first captured on the Car 22 video at approximately 2:03), McCue was asystolic as of approximately 9:06 p.m. when he was first assessed. [Presumably approximately 2:30 +/- by the Car 22 video timer.] The Decedent remained asystolic until approximately 9:18 p.m. (after he had been removed from the scene and taken by ambulance to the Emergency Room of the Eastern Maine Medical Center, where an artificial heart beat was induced). By the time that a heartbeat had been artificially induced -- after 12 minutes of being "flat lined" and without a heartbeat – Plaintiff's medical experts agree that McCue was effectively brain dead.

Plaintiff asserts that the actions of Defendants caused the death of his son, and that Defendants are legally responsible for the death.

Qualified immunity affords *limited* protection to public officials faced with liability under 42 U.S.C. Section 1983, "`insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Raiche v. Pietroski*, 623 F.3d 30 (1st Cir. 2010).

To determine whether qualified immunity applies in a given case, the court must determine: (1) whether a public official has violated a plaintiffs constitutionally protected right[2]; and (2) whether the particular right that the official has violated was clearly established at the time of the violation. *Estrada v. Rhode Island*, 594 F.3d 56, 62-63 (1st Cir. 2010); *Maldonado v. Fontanes*, 568 F.3d 263, 269-70 (1st Cir. 2009). Additionally, in applying the second prong, the court must consider two subsidiary issues: (a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case ô in other words, whether a reasonable person in the defendant's shoes "would have understood that his conduct violated the Plaintiff[`s] constitutional rights." *Id.* at 269.

---

[2] Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person. *See* U.S. Const., Amend. IV; *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). The Fourth Amendment is implicated where an officer exceeds the bounds of reasonable force in effecting an arrest or investigatory stop. *See Graham*, 490 U.S. at 394-95. The court must analyze excessive force claims according to the constitutional touchstone of objective reasonableness, without regard to an officer's subjective "intent or motivation." *Id.* at 397; *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001), *abrogated on other grounds by Pearson*, *supra*. Instead, the court must determine whether "the defendant officer employed force that was unreasonable under the circumstances." *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007); *see also Graham, supra*, 490 U.S. at 397. This determination requires the court to balance the individual's interest against the government's, weighing three non-exclusive factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham, supra*, 490 U.S. at 396; *see also Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009).

It is respectfully submitted, for the reasons set forth below, that expert witness testimony is necessary for the full and fair consideration of the "qualified immunity" defense raised by Defendants in the Motion: Specifically with respect to (a) Defendants' failure to attend to McCue's manifest serious medical needs, (b) the cause of the Decedent's death and (c) Bangor's failure to adequately train its officers, specifically with regard to the peril posed by placing weight on a pronate, restrained individual's back/shoulders for a prolonged period.[3]

## THE SPECIFIC EXPERT TESTIMONY
## NECESSARY HERE

### 1. To Establish that Defendants Failed to Attend to Decedent's "Serious Medical Needs."

**(Emergency Medicine Expert)**

Plaintiff maintains that Defendants failed to provide timely necessary, emergency medical care to McCue, that such failure led directly to his death and that such failure represents a gross violation of a constitutionally-protected, clearly-established right.

It is long established that the due process clause of the Fourteenth Amendment requires the responsible governmental authorities to provide medical care to persons who have been injured while being apprehended by the police. *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203 (1st Cir. 1990) (citing *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239 (1983)). The boundaries of that duty extend **at least as far** as the protection that the Eighth Amendment gives to a convicted prisoner. *Id.*

---

[3] Ever since the telephone conference with the Court and counsel on July 10, 2014 [captured in Report, Docket No. 32], wherein counsel for Defendants asserted that *Hegarty v. Somerset County*, 25 F.3d 17 (1st Cir. 1994), 53 F.3d 1367 (1st Cir. 1995) and its progeny preclude the introduction of expert testimony into the Court's consideration of the "qualified immunity" issue, Defendants have been urging the Court to accept the premise that same is the law of this Circuit. It is not. Neither *Hegarty* nor any other authority identified by the undersigned presents a strict rule against the introduction of expert testimony into the "qualified immunity" issue.

The Eighth Amendment imposes a duty to attend to a prisoner's "serious medical needs." *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988) (citing *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). Government officials violate the Constitution when they exhibit "deliberate indifference" to such needs. *Estelle v. Gamble,* 429 U.S. at 106.

A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gaudreault v. Municipality of Salem, Mass., 923 F.2d at 208.* The "seriousness" of an apprehended person's needs may also be determined by reference to the effect of the delay of treatment. *Id.*

It is respectfully submitted that the evidence adduced to date in discovery includes[4]:

1. Between 00:16 and approximately 1:34 of the Car 22 video (00:16 being the moment when Car 22 arrives at the scene of the subject confrontation between the Decedent and the defendant officers), the Decedent is held down pronate, with weight upon his back and shoulders and his face pushed down into the asphalt of the roadway (*see* 00:32, 00:35, 00:55, 1:07, 1:26), repeatedly punched (*see* 1:12, 1:30) and placed into a 5-point "hog tie" restraint (upper and lower extremities each restrained, the two restraints tied to each other).

2. At approximately 1:34, the Decedent makes his last utterance and is thereafter non-responsive.

---

[4] A "Car 22 [video] Timeline" is attached hereto and incorporated herein as a courtesy to the Court in its consideration of the video evidence. [Exhibit "A".] The Car 22 video has now twice been received by the Court as evidence herein. The undersigned recognizes that the within Exhibit is not itself evidence, but is merely intended as an aid to the Court. The said Exhibit was prepared by the undersigned's staff and the undersigned believes same to be accurate.

3. At approximately 1:46, the Decedent is picked up off the ground non-responsive (limp, like a rag doll – three Defendant Officers concede [Betters, Farrar and Kuhn] that they could not tell how long McCue had been non-responsive before he was picked up[5]; two Defendant Officers suggest that he was still resisting at the point when he was picked up [Blanchard and Donnell]; the video record speaks for itself and shows a limp, non-responsive Decedent at the point when he was picked up).

4. The Decedent is taken off-camera, where he was placed still in a five-point restraint.

5. Commencing at approximately 2:03, emergency rescue personnel (with EMT training) <u>nonchalantly</u> begin walking in the direction of the Decedent to attend to him. (Again, the video record speaks for itself – no one is running towards the Decedent or acting in the manner of any urgency. Rather, what the video captures is a casual walk in the direction of the dying McCue by the responding personnel.)

6. By the time emergency EMT personnel arrive at the scene of the Decedent – who is still hog tied – he has been non-responsive ("asystolic"/flat-lined to quote EMT Rudolf) for over 40 seconds.

***Plaintiff has engaged an expert in emergency medicine who, it is expected, shall testify that (a) the Decedent's "non-responsiveness" was apparent at least as of 1:40-1:46 of the Car 22 video; (b) being non-responsive represents a "serious" medical condition that requires immediate medical assistance/intervention; (c) that once a person is non-responsive, every second counts towards saving his/her life/preserving brain function; (d) that the providing of immediate medical assistance at the point of non-responsiveness could have saved the Decedent's life and (e) the failure to provide emergency care for an extended period of time likely led to the Decedent's effective brain death at the scene.***

---

[5] Officer Kuhn testified at deposition that he first noticed that McCue was unresponsive when the officers "picked him up" but was unsure of how long <u>prior</u> to that time he had been unresponsive. Officer Farrar's testimony on that point is identical. Officer Betters testified at deposition that he was "not sure" how long <u>prior</u> to being picked up that McCue had exhibited any verbalization or muscle function. *See* Deposition excerpts of the deposition transcripts of the oral depositions of Officers Betters, Farrar and Kuhn, at pages 76-78 (Betters), 37-39 (Farrar) and 45-49 (Kuhn), true and correct copies of which have been incorporated herein as Exhibit "B" hereto. Notably, officers Betters, Farrar and Kuhn subsequently attempted to alter this testimony in their deposition transcript *errata*. *See* Plaintiff's Motion for Sanctions (misuse of *errata* process), Docket No. 70.

There exists at least a genuine issue of material fact whether McCue presented a serious medical need at the moment that he became non-responsive -- and that non-responsiveness could have and, indeed, should have been immediately noted by the officers – which serious need was not timely addressed, which led to his death.

In light of the foregoing, Plaintiff should be permitted to incorporate the opinion(s) of such emergency medical expert to establish the Estate's claim that Defendants' failed to provide timely necessary, emergency medical care, and that same represents the deprivation of a constitutionally-protected, clearly-established right.

### 2. To Establish the Cause of Death.
### (Forensic Pathologist/Cardiologist)

Defendants raise in their Motion the cause of the Decedent's death (Fn. 2) while, at the same time, asserting that the cause of McCue's death "[is] not material for purposes of deciding the instant Motion. *See* Motion at Fn 2, p. 24.

The issue of "cause of death" is inescapably relevant to Defendants' summary judgment/qualified immunity motion: The fact that McCue was <u>dead</u> at the scene -- killed by a cardiac event secondary to asphyxia/metabolic hyperacidosis caused by being crushed into the pavement, pronate by the defendant officers – strongly (indeed, almost conclusively) establishes that he was non-responsive *before* he was picked up limp (as shown in the Car 22 video), which compels that determination that the Officers should have observed same and should have provided emergency medical care to him at that point.

Same – when contrast with Defendants' assertion (directly controverted by the Car 22 video) that McCue continued to fight all the way to the police car and died five days later (on September 17, 2015) of a drug reaction – creates at least a genuine issue of material fact preclusive of summary judgment.

In other words, McCue could not have been resisting if he was already in the throes of brain death, commencing immediately after 1:34 of the Car 22 video – and same should have been apparent to the Defendant Officers.

**Nothing creates a situation requiring immediate, emergency medical care like a man obviously dying.**

Plaintiff has engaged a cardiologist who is anticipated to testify as follows:

- The death of Phillip McCue was related to respiratory arrest with secondary cardiac arrest related to being hog tied and being put into the prone position. Individuals who are in a hypermetabolic state, such as after ingestion of "bath salts" or cocaine, require increased amounts of oxygen and it has been well recognized that respiratory muscle activity in the hog tied prone position is severely restricted, causing an inability for respiratory compensation of metabolic acidosis.

- The officers failed to recognize that the hog tied prone position in individuals who are hypermetobolic secondary to drug use - such as bath salts - poses a severe danger to the individuals ability to breathe properly. This issue has been discussed and presented to police departments across the country for the last ten years. The police officers should never have put him in the hog tied prone position in the back of the police cruiser. The delay of appropriate timely resuscitation efforts was the most likely the major contributor to McCue's cause of death (brain death).

- The time delay to react to the Decedent's loss of consciousness and probable cardio-respiratory arrest contributed to his severe anoxic brain damage which eventually led to his death.

- The improper restraining methods (hog tied prone position) by the Bangor police officers as well as the delay in the resuscitative efforts were the cause of Mr. McCue's death.

Additionally, Plaintiff has engaged a forensic pathologist who is anticipated to testify as follows:

- The Decedent died from complications of a struggle with prone physical restraint in the context of excited delirium from alpha-pyrrolidinovalerophenone (Alpha-PVP) intoxication.

- The mechanism of death was likely a lethal cardiac arrhythmia precipitated by the hyper-adrenergic state caused by excited delirium, though it appears that lethal trauma from neck compression was not sufficiently ruled out by this autopsy, which lacked a layered posterior back and neck dissection or a spinal cord examination.

- The manner of death in this case is better classified as a "homicide" rather than an "accident" because the actions (e.g., physical altercation and prone restraint) and inactions (e.g., lack of recognition of distress and immediate medical attention) of others, specifically, officers of the Bangor Police and Fire Departments, were directly responsible for this death.

### 3. To Establish that Defendant Bangor/Bangor Police Department Failed to Adequately Train and/or Supervise Its Officers Respecting the Danger Inherent in Placing Wight Upon a Prone Detained Individual's Back, Given the Well-Established Risks of Asphxia

**(Police Practices Experts)**

Plaintiff asserts independent claims herein against Defendants Bangor/the Bangor Police Department, to wit: That such Defendant <u>failed to adequately train/supervise its officers</u>, particularly with regard to the perils of death/asphyxia almost-universally acknowledged, associated with placing weight on a pronate, restrained individual's back.

The Defendant officers concede that they were never trained regarding such peril.

In its response to the Motion, Plaintiff shall call the Court's attention to myriad authority from a variety of Circuit Courts of Appeal (and District Courts) that such peril is well known and, indeed, has been well known for many years.

For example, in 2003, <u>nine years prior to this incident</u>, the Ninth Circuit in *Drummond v. City of Anaheim,* 343 F.3d 1052 (9th Cir. 2003) noted that "any reasonable officer" should be aware that "a prone, bound and agitated detainee" was at risk of asphyxia death from weight put upon his body. The *Drummond* court noted that that information was well within the training and instruction of Anaheim, California officers.

> The officers – indeed, any reasonable person – should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable. In this case, it is even more striking that the officers had been specifically warned of the extreme danger of this sort of force. Not only was there ample publicity in Southern California regarding similar instances of asphyxiation as a result of the use of similar force in the months before the incident, *see $650,000 Settlement OKd in Inmate Death,* L.A. TIMES, Feb. 24, 1999, at B4; *Supervisors*

> *Asked to OK $2.5 Million to Settle Suits,* L.A. TIMES, Feb. 2, 1999, at B1; but, more important, the Anaheim police department had issued a training bulletin in April of 1998 *specifically* warning officers that "when one or more [officers] are kneeling on a subject's back or neck to restrain him, compression asphyxia can result [`t]hat may be a precipitating factor in causing death.'" Anaheim Training Bulletin # 98-14 (Apr. 1998). *Although such training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable.* (343 F.3d at 1059, emphasis added.)[6]

The common sense awareness that putting substantial weight on a suspect's back or shoulders while he is prone and face down creates a risk of death has become fodder in numerous Circuit Court and District Court opinions. Although an exhaustive cataloging of all such opinions is beyond the scope of this pleading, particularly damning are the words of the Sixth (*Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004)

> The particular type of physical force exerted against Champion was unreasonable, and the Officers should have been aware that they were violating Champion's rights. …
>
> [I]t [is also] clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force. This appeal gives us no cause to consider whether leaving a bound suspect on his or her stomach without more constitutes excessive force that violates a suspect's clearly established Fourth Amendment rights. This is neither a "positional asphyxia" case nor a case in which the officers lightly touched or placed incidental pressure on Champion's back while he was face down. The asphyxia was caused by the combination of the Officers placing their weight upon Champion's body by lying across his back and simultaneously pepper spraying him. Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force. (Citations omitted.)

---

[6] The flip side of the emphasized language is particularly telling: Just as the providing of training is relevant respecting consideration of the qualified immunity defense, the <u>absence</u> of training is likewise relevant.

and Tenth (*Weigel v. Broad,* 544 F.3d 1143 (10th Cir. 2008))

> A review of the facts in the light most favorable to plaintiffs persuades us they give rise to a jury question regarding whether the officers acted reasonably. First*, there is evidence a reasonable officer would have known that the pressure placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk of asphyxiation and death. His apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation. See Cruz v. City of Laramie*, 239 F.3d 1183, 1188-89 (10th Cir. 2001) (agitated state constituted a clue to trained officer that pressure on the chest was likely to cause positional asphyxia). And WLEA training materials made clear that the pressure applied to Mr. Weigel's upper torso would suffice to cause his suffocation. í   (Emphasis added.)

Circuits.

**The Defendant Officers maintain that they were " never … trained that it is inappropriate to place weight on the shoulders or upper back of a prone suspect."** *See* **Defendants' Statement of Material Facts in Support of Defendants' Joint Motion for Summary Judgment" at Para. 152 [Docket No. 84].**

That failure of Bangor/the Bangor Police Department to so train creates a claim which Plaintiff should be permitted to develop through expert testimony herein.

Quite frankly, the Defendant Officers ó indeed, all police officers ó should be so trained.

Plaintiff has engaged two liability experts[7], one or both of which are anticipated to testify that it was improper and a manifest failure (actionable pursuant to the constitutional framework at issue in this case) for Defendant Bangor to have not trained its officers that

---

[7] Plaintiff is mindful that multiple expert witnesses, rendering the same opinion(s), is inappropriate. The two engaged experts are not cumulative. Rather, they have been engaged to render opinions with regard to different aspects of this case. The foregoing being said, their opinions coincide with regard to the failure of Bangor to train its officers with respect to the peril occasioned by placing weight upon the back of a restrained, prone individual.

putting substantial weight on a suspect's back or shoulders while he is prone and face down creates a risk of death.[8]

---

[8]      Plaintiff's training/practices experts may be identified as follows:

1. *Former Chief of Police and Assistant Chief of Police. Former police Commander of the Personnel and Training Unit, Commander of the Homicide Unit, Commander of the Internal Affairs Unit and Commander of Uniform Patrol. Assessor and Team Leader for accreditation body respecting law enforcement agencies.* Plaintiff anticipates that he shall base his aforesaid opinion upon the following determinations: 1. McCue was subjected to force that was not objectively reasonable when his neck and head were compressed by a Bangor Police Officer utilizing his knee and body weight in addition to pushing his head into the road surface. McCue's neck and head were compressed for nearly four minutes and 48 seconds. Compressing McCue's head and neck is not consistent with generally accepted police practices and procedures. 2. McCue was subjected to force that was not objectively reasonable when his chest and upper torso were compressed by the weight of two and at times up to five officers, while he was handcuffed. The force so described was not consistent with generally accepted police practices and procedures. 3. McCue was "hog-tied" by members of the Bangor Police Department. Hog-tieing an individual is not objectively reasonable use of force and is inconsistent with generally accepted police practices and procedures. McCue was "hog-tied" by having his ankles bound and then tied to his handcuffed wrists with a dog leash. 4. After Mr. McCue was hog-tied and brought to the police car, the audio of the police Dash-Cam recorded unknown officers commenting that McCue may be suffering from excited delirium. Given those specific comments, the Bangor Police Officers dealing with McCue knew, or should have known, McCue's actions were indicative of someone who might be suffering from excited delirium, yet they engaged in a course of conduct known to be detrimental to individuals who may be suffering from excited delirium. The Bangor Police Department utilizes the Taser weapon and is periodically provided updates by Taser International. One of the Taser International training updates cautioned police departments and its officers that individuals who exhibit signs of excited delirium have a greater propensity for sudden in-custody death. However, the members of the Bangor Police Department ignored those warnings and used such force that was not objectively reasonable and knew, or should have known, such force could contribute to sudden in-custody death. 5. McCue was subjected to indiscriminate punches by Bangor Police Officers while he was on the ground, handcuffed, for no apparent reason. McCue was not in a position to resist, given the number of officers on his body, while lying on the ground, face down, handcuffed. The punching of McCue was not objectively reasonable and was not consistent with generally accepted police practices and procedures. 6. During the time McCue was on the ground with various officers on his back, legs, neck, and torso, McCue stated approximately 18 times that he was either hurt, his neck hurt, his foot hurt, his leg hurt, he gave up, or his heart hurt, yet the Bangor Police Officers ignored his pleas until he slipped into unconsciousness. McCue was lifted, while hog-tied, and placed near a patrol car in an unconscious state. The members of the Bangor Police Department involved in this incident did not provide the standard of care required by Bangor Police Department policy and generally accepted police practices and procedures. 7. In light of the foregoing facts, the absence of training respecting the inappropriateness of placing weight upon McCue's back and/or shoulders, while he was prone, restrained and agitated, was a violation of standards, training, procedures and policies necessary to avoid deprivation of a constitutionally-protected, clearly-established right.

2. *Thirty years experience as police officer and police trainer (certified and employed as a police officer in three states and has trained over 15,000 police, security and military personnel in case law, use-of-force techniques and procedures, as well as general instructor-development curriculum). Guest-lecturer in national use-of-force symposiums. Ten years experience in forensic consulting.* Plaintiff anticipates that he shall base his aforesaid opinion upon the following determinations: With regard to the arrest of Phillip McCue, "good and reasonable police practices" broke down as officers attempted to restrain him in a manner known to be consistent with "arrest asphyxia" and which was exacerbated by McCue's apparent drug-induced excited delirium. Noted deficiencies in officer conduct that conflict with what "reasonable and prudent" officers would have done include as follows: Officers apparently knew that McCue's condition was

## **CONCLUSION**

By reason of the foregoing, Plaintiff prays that he be permitted expert discovery/inclusion of expert testimony in response to Defendants' motion for summary judgment/qualified immunity, pursuant to Docket No. 73.

Dated at Lewiston, Maine this 23rd day of April, 2015.

/s/David Van Dyke, Esq.
Hornblower Lynch Rabasco& Van Dyke
261 Ash Street - P.O. Box 116
Lewiston, Maine 04243-0116
Tel. 207-786-6641
dvandyke@HLRVD.com

---

drug-induced and that his manic behavior was consistent with that of excited delirium, yet exhibited little or no operational concern for this likelihood. Officers should have known that prolonged downward pressure against McCue's (prone) neck and upper torso heightened the likelihood of compression asphyxia. McCue's pleas for more humane treatment should have been considered more relevantly and urgently when he complained of pain in his chest. Hog-tying McCue after a prolonged period in which he had had his upper torso compressed against the ground also had foreseeable risk of serious injury or death. In light of the foregoing facts, the absence of training respecting the inappropriateness of placing weight upon McCue's back and/or shoulders, while he was prone, restrained and agitated, was a violation of standards, training, procedures and policies necessary to avoid deprivation of a constitutionally-protected, clearly-established right. The foregoing deficiencies in officer conduct represent the use of excessive force and/or the failure to provide appropriate and necessary medical care, in violation of McCue's civil and constitutional rights. The factors which inform the foregoing opinions include as follows: There were as many as five officers present with which to subdue Phillip McCue. The involved BPD officers were trained in viable control and restraint techniques. The officers who engaged in the arrest of Phillip McCue were mostly seasoned, veteran police officers. At least one officer was equipped with an X26 Taser, and employed it to subdue Phillip McCue. Almost all of the "active resistance" to arrest that was exhibited by Phillip McCue seemed focused upon avoidance of arrest and was not indicative of behavior threatening to officer safety. The limited amount of "kicking" that McCue exhibited in the prone position was likely involuntary lower-leg responses to pain that McCue was vocal about experiencing. One officer, unhappy about getting "kicked" by the decedent, forcefully punches McCue several times in the lower leg area. It took too much time for officers to note labored breathing and, ultimately, that McCue's breathing had stopped. When a subject exhibits active resistance to arrest, the generally accepted professional practice is to respond with "soft empty hand control" techniques. At best, McCue had only committed misdemeanor offenses prior to his resistance to arrest, the worst of which were arguably those acts he committed within his own apartment. Knowing that McCue had only committed misdemeanor offenses, and knowing that he was likely suffering from excited delirium, the manner in which McCue was subdued carried known risks that were exceptionally disproportionate to crimes he may have committed.

# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

I hereby certify that on April 23, 2015, I electronically filed the within

**PLAINTIFF'S MOTION TO
PERMIT/NOTICE OF INTENT TO USE EXPERT TESTIMONY
IN CONTEXT OF
HIS OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT/QUALIFIED IMMUNITY
[PURSUANT TO DOCKET NO. 73]**

using the DM/ECF system which will send notification of such filing to co-counsel for Plaintiff and counsel for Defendants, and I hereby certify that same shall be timely mailed by United States Postal Service or otherwise served upon Plaintiff.

/s/ David Van Dyke, Esq.
Hornblower Lynch Rabasco& Van Dyke
261 Ash Street - P.O. Box 116
Lewiston, Maine 04243-0116
Tel. 207-786-6641
dvandyke@HLRVD.com