UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL MCCUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-cv-00098-GZS |
| | ) | |
| CITY OF BANGOR, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Michael McCue alleges that Defendant City of Bangor and six of its police officers are liable for the officers' use of excessive force on and their deliberate indifference to the serious medical needs of Phillip McCue, whom the officers placed under protective custody on September 12, 2012, due to erratic behavior that was apparently related to the ingestion of bath salts.

The matter is before the Court on Defendants' Joint Motion for Summary Judgment (ECF No. 83).[1]  Following a review of the summary judgment record, and after consideration of the parties' arguments, the recommendation is that the Court grant in part and deny in part the motion.

**BACKGROUND** [2]

*September 12, 2012*

On September 12, 2012, Phillip McCue was at an apartment building located at 18 First Street in Bangor, Maine.  Due to Mr. McCue's erratic behavior, which witnesses described as

---

[1] The Court referred the motion for report and recommended decision.

[2] The facts set forth herein are derived from the parties' Local Rule 56 statements of material facts, and are presented in the light most favorable to Plaintiff.

ranting and raving, yelling and screaming, and stomping and kicking at doors, an individual who was at the apartment building placed a call to the Bangor Police Department.  (Defendants' Statement of Material Facts (DSMF) ¶¶ 4 – 12, ECF No. 84.) [3]  Mr. McCue's behavior was attributed to his ingestion of bath salts.  (*Id.* ¶ 9.)  The caller informed the police department of a bizarre situation involving an individual yelling very loudly and pacing back and forth, advised that he did not know if drugs and alcohol were involved, and suggested that the situation should be investigated.  (*Id.* ¶ 13.)  Dispatch directed the call to Officer Kimberly Donnell, who responded to the scene.  (*Id.* ¶¶ 14 – 15.)

Officer Donnell met with the caller upon her arrival, who informed her of Mr. McCue's strange behavior and led her upstairs to the second floor of the building.  Officer Donnell heard yelling and crashing coming from upstairs.  (*Id.* ¶¶ 15 – 17.)  When Officer Donnell arrived at the second floor, Mr. McCue screamed something and then jumped over a banister in the third floor hallway and landed approximately eight feet below on the stairway that led to the second floor. (*Id.* ¶ 19.)  Upon landing, Mr. McCue put either his shoulder or elbow through the stairway wall, causing a hole that was a little larger than a softball.  (*Id.* ¶ 20.)  Mr. McCue threw a beer bottle and screamed an obscenity after landing in the stairway.  (*Id.* ¶ 21.)  He then ran past Officer Donnell and exited the building.  (*Id.* ¶¶ 21 – 22.)  Officer Donnell called for backup and exited the building to look for Mr. McCue.  (*Id.* ¶¶ 23 – 24.)

Officer Wade Betters responded to Officer Donnell's request for backup and the two officers followed Mr. McCue in a police vehicle.  (*Id.* ¶¶ 25 – 26.)  The officers made contact with Mr. McCue near the Central Fire Station on Main Street in an attempt to talk to him.  (*Id.* ¶ 28.)

---

[3] Citations to Defendants' Statement of Material Facts are meant to include reference to Plaintiff's Opposing Statement, entitled "Plaintiff's Counterstatement of Material Facts" (ECF No. 91), wherein Plaintiff admits, qualifies, or denies Defendants' statements.

Mr. McCue had been running before the officers made contact with him, and when they made contact, Mr. McCue began pacing.  (*Id.* ¶ 29.)  Because Mr. McCue was still yelling at this point, the officers issued a disorderly conduct warning and also a warning to stay out of the roadway.  (*Id.* ¶ 30.)

Mr. McCue then responded with either an obscenity or something incomprehensible.  (*Id.* ¶ 31.)  Officer Betters or Officer Donnell asked a third officer, Ryan Jones (not a defendant), to monitor Mr. McCue while they returned to 18 First Street to gather more information.  (*Id.* ¶¶ 33 – 34.)  A person at 18 First Street told Officer Donnell that Mr. McCue was a bath salts user and that he may have been using bath salts that evening.  (*Id.* ¶ 36.)  Officers Betters and Donnell left the building and saw Mr. McCue again, who began yelling and screaming profanities at the officers, gestured to them in some manner, and challenged them to chase him.  (*Id.* ¶ 37.)  Based on his knowledge of Mr. McCue's behavior and actions, Officer Betters advised Bangor police units that Mr. McCue needed to be taken into protective custody for a professional evaluation.  (*Id.* ¶ 40.)

The Bangor Police Department has a policy entitled "Response to Mental Illness and Involuntary Commitment," which policy provides that the police department will assist individuals who appear to be mentally ill or are experiencing a mental health crisis.  (*Id.* ¶ 41.)  The policy defines "mental health crisis" as behavior—including a loss of contact with reality and extreme agitation—that creates a threat of imminent and substantial physical harm to the person experiencing the behavior or to others and that appears to be of sufficient severity to require professional evaluation.  (*Id.* ¶ 42.)  The policy also states that "protective custody" is needed when an officer has reasonable grounds to believe that a person seems mentally ill and presents a threat of immediate and substantial physical harm to himself or third persons.  (*Id.* ¶ 43.)  A "threat of

imminent and substantial physical harm" includes a reasonably foreseeable risk of harm to a person, including the individual who is experiencing the crisis. (*Id.* ¶ 44.) If an officer determines that an individual needs to be taken into protective custody, the officer must transport the person to a hospital for professional evaluation. (*Id.* ¶ 46.) [4]

Officers David Farrar and Joshua Kuhn, who were among the officers who heard Officer Betters report that Mr. McCue should be detained for protective custody reasons, located Mr. McCue at dusk near the intersection of First and Cedar Streets. (*Id.* ¶¶ 47, 50.) They exited their vehicle and spoke to Mr. McCue, who either responded unintelligibly or snarled at the officers before running away from them down Cedar Street. (*Id.* ¶¶ 51 – 52.) Officer Jones, meanwhile, while driving his police vehicle along Main Street, had to stop his vehicle suddenly to avoid hitting Mr. McCue, who ran in front of his vehicle. (*Id.* ¶¶ 53 – 55.) Officer Betters and Officer Kuhn, each driving a different vehicle, unsuccessfully attempted to restrict Mr. McCue's movement. (*Id.* ¶¶ 57 – 58.) Officers Farrar and Kuhn then pursued Mr. McCue on foot and apprehended him when he tripped and fell in the roadway in front of the Central Fire Station. (*Id.* ¶¶ 60, 62.)

When Officers Farrar and Kuhn reached Mr. McCue, he was on the ground on his stomach. (*Id.* ¶ 61.) A Bangor Fire Department fire engine that was in the vicinity pulled across Main Street and parked to block off traffic. (*Id.* ¶ 63.) Four Bangor Fire Department members were on the fire engine. Three of the members were paramedics and one was an emergency medical technician.

---

[4] Defendants object to statements that Plaintiff offers to suggest that Mr. McCue had not engaged in criminal activity prior to the decision to take him into custody. (E.g., Plaintiff's Statement of Additional Material Facts (PSAMF) ¶¶ 161 – 162, ECF No. 91.) Presumably, Plaintiff offered the facts, in part, because Defendants argued in the motion for summary judgment that the arrest was proper based on the existence of probable cause to believe Mr. McCue had engaged in certain misdemeanor offenses, including some offenses in the presence of one or more officers. This Recommended Decision does not attempt to resolve this dispute because Plaintiff has not presented facts sufficient to contest Defendants' assertion that reasonable grounds existed to take Mr. McCue into protective custody. Nothing in the record or in the parties' respective presentations suggests that the legal standards that apply to the liability determination would differ if the seizure had occurred for purposes of a misdemeanor arrest rather than for purposes of protective custody.

(*Id.* ¶ 64.)  Other Bangor Fire Department emergency personnel were also standing nearby while the events with Mr. McCue unfolded.  (*Id.* ¶ 65.)

Upon reaching Mr. McCue, Officer Kuhn initially placed his chest on Mr. McCue's shoulder and asked him to give up his hands, but Mr. McCue refused and pulled his hands underneath his body.  (*Id.* ¶ 73.)  Officers Kuhn and Farrar repeatedly ordered Mr. McCue to give them his hands, but he refused, swore at the officers, and threatened to kill them.  (*Id.* ¶ 74.)  Officer Kuhn placed his finger on a pressure point underneath Mr. McCue's nose in order to gain pain compliance to get Mr. McCue to give up his hands, but the pressure point hold had no effect on Mr. McCue.  (*Id.* ¶ 75.)  Officer Farrar struck Mr. McCue a couple of times in his arm in order to gain pain compliance to get Mr. McCue to give up his hands, but Mr. McCue refused.[5]  (*Id.* ¶ 77.)

When Officer Donnell arrived on the scene, she placed herself on Mr. McCue's legs because he was still kicking and resisting.  (*Id.* ¶ 79.)  Mr. McCue continued to keep his arms underneath his body and to refuse to give up his hands.  (*Id.* ¶ 80.) [6]

Mr. McCue was very upset and agitated, and he was non-compliant (swearing, growling, and struggling), but the officers kept him in a face-down, prone position until he was thoroughly secured in a five-point restraint[7] through the efforts of, at different times, between two and five

---

[5] Officers are trained that the use of strikes or punches to soft muscle tissue is an acceptable use of force to gain pain compliance.  (DSMF ¶ 78.)

[6] The circumstances that followed are described by the parties in varying terms.  To some extent, video recordings taken by the onboard cameras of certain police vehicles capture the encounter.  The video recording system from cruiser 15 captured limited portions of the officers' interactions with Mr. McCue prior to the physical interaction with him on Main Street.  The video recording system from vehicle 22 captured much of the physical altercation between Mr. McCue and the officers on Main Street.  (DSMF ¶¶ 159 – 160.)

[7] The type of five-point restraint applied to Plaintiff is colloquially referred to as "hog-tying" and would not have permitted Plaintiff to walk (as opposed to five-point restraints that permit a person to shuffle-walk).  The record includes references to both "five-point restraint" and "hog-tie" and the terms are largely interchangeable for purposes of the pending motion.  Defendants note, however, that they left between 18 and 24 inches of separation between Mr. McCue's wrist cuffs and ankle ties.  (DSMF ¶ 137.)

officers.  Officers Farrar and Kuhn applied much of the force that prevented Mr. McCue from getting up.  One officer was on Mr. McCue's right side, kneeling on his back.  The other was on the left side, kneeling on Mr. McCue's shoulder and neck.  At one time, Mr. McCue can be heard to complain that the officers were hurting his neck.  According to the officers, they varied the weight they applied depending on the degree of resistance exerted by Mr. McCue. [8]

During the encounter, Officer Donnell warned Mr. McCue that she was going to "tase" him if he did not give up his arms, but he continued to refuse to do so.  (*Id.* ¶ 92.)  Officer Donnell then "tased" Mr. McCue on the right side of his lower back with her Taser electronic control weapon.  (*Id.* ¶ 105.)  She used a combination Taser setting of probe deployment mode and stun-drive mode in order to maximize its effectiveness, which was necessary to complete the circuit because of her closeness to Mr. McCue.  (*Id.* ¶ 106.)  She applied the Taser one time, for a five-second cycle.  (*Id.* ¶ 107.)  Officers Donnell and Kuhn each took control of an arm and succeeded in handcuffing Mr. McCue's arms behind his back.  (*Id.* ¶¶ 108 – 112.)  Mr. McCue again made unintelligible exclamations and swore at the officers.  He also began kicking his feet.  (*Id.* ¶ 114.)  The officers then focused their attention on securing Mr. McCue's legs, while continuing to hold him face-down on the ground.  By this time, the officers had held Mr. McCue to the ground for more than a minute.[9]  After Mr. McCue's hands were secure, the degree of force applied to Mr. McCue's upper body lessened, but then increased when he began kicking his legs after Officer

---

[8] Officer Farrar was trained that when a suspect is prone on the ground resisting, it is proper procedure to place weight on the suspect's shoulder to gain control of the suspect's arm for safety reasons.  (DSMF ¶ 89.)  Officer Blanchard was also trained at the police academy in Vermont and as part of his Military Police training with the United States Army that it is a proper technique to apply force to a suspect's shoulders if the suspect is resisting while prone on the ground.  (*Id.* ¶ 91.)

[9] The parties agree that car 22 arrived sometime after McCue was first held to the ground, and that the amount of time is "indeterminate," but it does not appear that the amount of time would significantly exceed a minute.  (PSAMF ¶ 166.)

Donnell stood up from kneeling on his legs.  The video reveals that Mr. McCue is at times physically resisting the efforts to restrain him.  Two officers applied what could be viewed as significant weight to Mr. McCue's shoulders and neck for a period of time, perhaps as much as four to five minutes, while other officers attempted to secure his feet.[10]  During this time, Officer Blanchard's hand became trapped between Mr. McCue's ankles.  Officer Blanchard delivered a series of punches to Mr. McCue's lower extremity to obtain "pain compliance" so that Mr. McCue would release his hand.[11]  (*Id.* ¶¶ 119 – 120.)

After Officer Blanchard freed his hand from Mr. McCue's ankles, he and Officer Donnell secured Mr. McCue's ankles with flex cuffs (zip ties) that Officer Betters had retrieved.  (*Id.* ¶¶ 122, 129.)  Officer Blanchard then inspected Mr. McCue's handcuffs to make sure they were double-locked, which is done to prevent the handcuffs tightening and causing the suspect injury.  (*Id.* ¶ 123.)  Thereafter, the officers tied together the ankle cuffs and the wrist cuffs using a dog leash retrieved from a police vehicle.  (*Id.* ¶¶ 129, 136.)  Officer Blanchard also struck Mr. McCue's lower back, buttocks, or thigh.  According to Officer Blanchard, he did so because Mr. McCue had a hold of Officer Blanchard's injured hand and squeezed it extremely hard.[12]  (*Id.* ¶ 124.)  It is also conceivable that Officer Blanchard struck Mr. McCue to facilitate bringing together Mr. McCue's ankles and wrists to complete the five-point restraint.[13]

---

[10] The officers initially tried to handcuff Mr. McCue's feet together, but removed the handcuffs because they were too tight and were going to cut into McCue's skin.  (DSMF ¶ 116.)  Defendants object to Plaintiff's assertion that "there was a 4 minute and 25 second time lapse between the onset of Mr. McCue's arrest and the commencement of CPR," which statement includes a citation to the Affidavit of David Hile, MD (ECF No. 92-13).

[11] Plaintiff admits that Officer Blanchard suffered torn ligaments between his ring and middle fingers and missed roughly four-and-a-half months of work from the resulting injury.  (DSMF ¶ 112.)

[12] Officer Blanchard had learned through training that punches are an acceptable use of force for distracting and gaining pain compliance over a subject.  (DSMF ¶ 126.)

[13] Officer Blanchard suggested that Mr. McCue be placed in a five-point restraint as a safety measure to protect Mr. McCue and the officers, because Mr. McCue had continued to flail his legs and grab with his hands.  (DSMF ¶ 130.)  The officers had been trained that when a subject is actively resisting, it is important to get the subject's legs, arms,

Plaintiff concedes that the officers placed Mr. McCue in the five-point restraint to get him under control and to prevent him from continuing to kick at the police officers.  (*Id.* ¶ 134.) Plaintiff further acknowledges that the officers' goal at all times during the physical encounter with Mr. McCue was to restrain and control him in order to transport him to the hospital for an evaluation. (*Id.* ¶ 156.)  The officers ultimately lifted Mr. McCue from the ground, at which time, Mr. McCue could have been unconscious.

Between the time that the officers lifted Mr. McCue off the ground and carried him to a police vehicle a few yards away, the officers noticed that Mr. McCue was unresponsive.  (DSMF ¶ 143; Plaintiff's Statement of Additional Material Facts (PSAMF) ¶ 176, ECF No. 91.)[14]  Officer Betters radioed for an ambulance.  (DSMF ¶ 145.)   From the car 22 video, this call occurred between 7:36 and 7:50 minutes.  At approximately 8:17 minutes, two firemen exited the parked fire truck and approached.  One officer stated that Mr. McCue appeared to be overdosing at that time.  Other emergency responders, not seen on the video, were present within seconds.  (*Id.* ¶¶ 146 – 147.)

As the emergency responders were on their way to assist, Officer Blanchard cut the leash that was securing Mr. McCue's handcuffs to his leg restraints.  (*Id.* ¶ 148.)  The emergency medical responders then began providing medical attention to Mr. McCue, and eventually he was taken to the hospital via ambulance.  (*Id.* ¶ 149.)  Plaintiff asserts that the emergency responders who are

---

and limbs under control.  (*Id.* ¶ 131.)  The Maine Academy teaches its officers that a handcuffed suspect is not necessarily subdued, and can still be dangerous.  Officers must eliminate the threat posed by the suspect.  (*Id.* ¶ 132.) Officer Blanchard had been trained by the criminal justice academy in Vermont and as part of his Military Police training with the United States Army that five point restraints are an acceptable technique to restrain and control combative subjects.  (*Id.* ¶ 133.)  The Maine Academy does not teach its students about five-point restraints, including whether it is an appropriate or inappropriate method of restraint.  (*Id.* ¶ 135.)

[14] Citations to Plaintiff's Statement of Additional Material Facts are meant to include reference to Defendants' Reply Statement (ECF No. 96), wherein Defendants admit, qualify, deny and/or object to Plaintiff's statements.  Plaintiff's additional statements commence with paragraph 161 in Plaintiff's "Counterstatement of Material Facts."

seen on the video neither ran nor showed other signs of urgency.  (PSAMF ¶ 174.)  Mr. McCue was asystolic (without cardiac rhythm) at this time.  (*Id.* ¶ 185.)  Plaintiff contends that Mr. McCue died as the result of his encounter with Defendants.  (*Id.* ¶ 221.)

*Training and Standards*

The Bangor Police Department's Use of Force Policy defines "non-deadly force" as "any physical force which is not deadly force."  (DSMF ¶ 67.)  Under the Policy, electronic weapons are considered non-deadly force.  (*Id.* ¶ 68.)  The Policy permits the use of non-deadly force when and to the extent the officer reasonably believes it is necessary to effect an arrest or to prevent an escape from custody, unless the officer knows the arrest is illegal.  (*Id.* ¶ 69.)  The Policy also permits the use of non-deadly force to defend the officer from what the officer reasonably believes to be the imminent use of non-deadly force encountered during an arrest or while seeking to prevent an escape.  (*Id.* ¶ 70.)

The Department also has an Electronic Control Weapons (TASER) Policy.  (*Id.* ¶ 93.)  The ECW policy provides that an electronic control weapon may be used when and to the extent the officer reasonably and actually believes it necessary to effect an arrest or to prevent the escape from custody of an arrested person.  (*Id.* ¶ 94.)  The ECW policy informs officers that electronic control weapons reduce the need for hands-on physical force during an arrest, and when used properly can reduce the risk of injury to officers and suspects.  (*Id.* ¶ 95.)  Officers are directed to use the electronic control weapon the least number of times necessary to accomplish their legitimate goals.  (*Id.* ¶ 96.)  The Policy further states that when reasonably possible, the suspect's back should be the primary target.  (*Id.* ¶ 97.)  The policy does not prohibit officers from using electronic control weapons on subjects exhibiting signs of excited delirium.  (*Id.* ¶ 98.)  Instead, officers are instructed to "keep in mind" that persons may be suffering from excited delirium and,

if the officer believes that to be the case, medical attention shall be sought.  (*Id.* ¶ 99.)  The Policy lists electronic weapons as non-deadly force, and indicates that such weapons are appropriate use of force options when a suspect is being resistive or assaultive / high risk.  (*Id.* ¶ 100.)

The Maine Criminal Justice Academy, where most of the officers received training, teaches its students:

> that when a suspect is on the ground, officers should handcuff the suspect in the prone position (*id.* ¶ 71);
>
> that the use of a pressure point hold is an acceptable use of force to gain pain compliance over a subject (*id.* ¶ 76);
>
> that if a suspect is on the ground resisting arrest, officers should put pressure generally on the middle of the suspect's back in order to gain control over the suspect's arms (*id.* ¶ 90);
>
> that the Taser is an acceptable and commonly used tool for gaining restraint and control over a subject who is threatening the officer or resisting arrest (*id.* ¶ 101);
>
> that officers must assess the situation when considering ECW options and use the situational use of force option that will eliminate the threat posed by the suspect (*id.* ¶ 102); and
>
> that there are peripheral issues that could arise if a Taser is used on someone exhibiting excited delirium, which could potentially include serious injury and death, but the bottom line is that the officer must eliminate the threat posed by the suspect (*id.* ¶ 103).[15]

The Maine Criminal Justice Academy's training about the connection between prone restraint and the risk of positional asphyxia is limited.  In particular, officers are instructed that after a suspect is secured and placed into a police vehicle, the suspect should be placed in a seated position and not face down on his stomach in the back of the vehicle.  (*Id.* ¶ 150.)  Officer Blanchard had been trained that if a suspect has been in a five-point restraint for an extended period of time, the risk of asphyxia is something to be aware of and to monitor the suspect.  (*Id.* ¶ 151.)

---

[15] Officer Donnell was trained that her decision of whether to use a Taser should not be based on whether the suspect may be exhibiting signs of excited delirium.  (DSMF ¶ 104.)

In their training, none of the officers had been advised that it is inappropriate to place weight on the shoulders or upper back of a prone suspect.  (*Id.* ¶ 152.)

The Academy trains its students on the "ABCs" of tactical first aid, which training focuses on issues involving airways, breathing, circulation, and hemorrhaging.  (*Id.* ¶ 157.)  According to the training, if a suspect is having a medical issue related to airways, breathing, or circulation, the officer should request help from experienced medical professionals to permit the medical professionals to render the appropriate medical aid that the suspect needs.  (*Id.* ¶ 158.)  Officer Blanchard had previously been trained as an emergency medical technician that a sign of asphyxia is cyanosis, or the "bluing" of the lips.  (*Id.* ¶ 154.)  Officer Blanchard never saw Mr. McCue exhibit any signs of cyanosis.  (*Id.* ¶ 155.)  Plaintiff maintains that all of the officers were trained to monitor someone who is restrained to make sure that he is breathing normally.  (PSAMF ¶ 177.)

*Prolonged prone restraint and excited delirium*

Mr. McCue's behavior on September 12, 2012, was consistent with a condition known as "excited delirium."  The officers were familiar with this condition and would agree that excited delirium could describe Mr. McCue's behavior, though not all of the officers were thinking of excited delirium at the time of their encounter with Mr. McCue.  (*Id.* ¶ 164.)

David Hile, MD, one of Plaintiff's expert witnesses, has opined that Mr. McCue's loss of consciousness and cardiopulmonary arrest were the product of "prolonged prone restraint under the weight of multiple officers, in the face of a hypermetabolic state of excited delirium."  (*Id.* ¶ 180.)[16]  Dr. Hile explains that "Mr. McCue's inability to hyperventilate and compensate for metabolic acidosis in his state of excited delirium led to his cardiopulmonary arrest."  (*Id.*)  In Dr. Hile's assessment, delay in the identification of Mr. McCue's cardiopulmonary arrest, delay in

---

[16] Affidavit of David Hile, MD, ECF No. 92-13.

removal of the five-point restraint, and delay in applying CPR, in combination, were the likely cause of Mr. McCue's death.  (*Id.* ¶¶ 182 – 183.)

Thomas Aveni, a law enforcement officer with 35 years of experience, including officer training, and executive director of the Police Policy Studies Council, through which he lectures nationally on, inter alia, "use of force management," is also designated as an expert witness in support of Plaintiff's case.  Mr. Aveni states:

> It is virtually universally understood and acknowledged among police departments and training professionals that the placing of weight or downward pressure for a prolonged period of time upon the back or shoulders of a prone individual being restrained creates a risk of death from compression asphyxia or cardiac events arising from such conditions.

(*Id.* ¶¶ 213 – 214.)[17]   According to Mr. Aveni, any reasonable, trained officer would have understood the risk associated with this form of restraint and would have carefully monitored the situation for loss of consciousness.  (*Id.* ¶ 215.)  Additionally, Mr. Aveni opines that the amount of time during which Mr. McCue was restrained in this fashion would be understood by a reasonable officer as prolonged.  (*Id.* ¶ 216.)

Judy Melinek, a physician and licensed forensic pathologist, is also designated as an expert witness in support of Plaintiff's case.[18]  Dr. Melinek opines that the cause of Mr. McCue's death was "likely a lethal cardiac arrhythmia precipitated by the hyper-adrenergic state caused by excited delirium" secondary to "alpha-pyrrolidinovalerophenone (Alpha-PVP) intoxication," combined with "a struggle with prone physical restraint."  (*Id.* ¶¶ 221 – 222.)

---

[17] Affidavit of Thomas Aveni, ECF No. 92-12.

[18] Affidavit of Judy Melinek, ECF No. 92-14.

### STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011).  If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

### DISCUSSION

Defendants argue that the record does not and cannot support a finding that the officers lacked an objectively reasonable basis to seize Mr. McCue (Motion at 9 – 12), or that they applied an excessive degree of force (*id.* at 13 – 30).  Defendants further contend that the record does not establish a basis for a finding that Defendants were deliberately indifferent to Mr. McCue's medical needs.  (*Id.* at 30 – 32.)  Defendants maintain that even if the record contains factual disputes as to Plaintiff's claims under 42 U.S.C. § 1983, the individual Defendants are entitled to

protection from liability under the doctrine of qualified immunity. (*Id., passim.*) Defendants also contend that a finding of qualified immunity entitles them to summary judgment on some of Plaintiff's state law tort claims. (*Id.* at 32 – 35.)

**A.    Section 1983**

Pursuant to the federal civil rights statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

42 U.S.C. § 1983.

Government officers are entitled to qualified immunity unless they violate a constitutional right that was "clearly established" when they engaged in the conduct at issue. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo*, 973 F.2d 39, 42 (1st Cir. 1992)).

Defendants' assertion of qualified immunity requires the Court to assess: (1) "whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation" and (2) "whether the violated right was clearly established at the time that the offending

conduct occurred." *Ford v. Bender,* 768 F.3d 15, 23 (1st Cir. 2014).  When the Court considers whether the constitutional right was clearly established at the time, the Court must determine (a) "whether the contours of the right, in general, were sufficiently clear," and (b) "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Id.*

The qualified immunity analysis must include a consideration of the particularized facts of the case, not broad general propositions. *Hunt*, 773 F.3d at 368.  Thus, "the relevant question is not whether the Fourth Amendment generally prohibited excessive force." *Id.*  Instead, on the claim of excessive force, the issue is whether Mr. McCue had a clearly established right not to be subjected to certain elements of force that Defendants applied.

"To be clearly established, the contours of this right must have been 'sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).  "In other words, 'existing precedent must have placed the ... constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

### 1.   *Excessive force*

Excessive force claims are evaluated under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (some internal quotation marks omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Relevant factors for consideration include "the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* [19] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* A court's assessment must also account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The test is an objective test: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The focus of the summary judgment filings is whether qualified immunity precludes Plaintiff from proceeding against the individual Defendants. The constitutional prohibition against the use of excessive force has long been clearly established. *See, e.g.*, *Morelli*, 552 F.3d 12, 23-24 (1st Cir. 2009) (describing the law in this area as "crystal clear"). On the "threshold question" of whether the alleged facts could support a constitutional violation, as explained further below, "[t]aken in the light most favorable to the party asserting injury,"[20] the record could support a finding that Defendants continued to employ significant force after Mr. McCue ceased resisting and no longer posed a threat to the officers or himself. The alleged facts, when viewed most favorably to Plaintiff, therefore, could support Plaintiff's claim that Defendants violated Mr. McCue's constitutional rights.

---

[19] *See also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (listing the following non-exhaustive factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting").

[20] *Saucier v. Katz*, 533 U.S. 194, 200 (2001) ("A court required to rule on the qualified immunity issue must consider … this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?")

Plaintiff, however, cannot rely on the Fourth Amendment's general prohibition against the use of excessive force to overcome Defendants' assertion of qualified immunity. *Hunt*, 773 F.3d at 368 ("[T]he relevant question is not whether the Fourth Amendment generally prohibit[s] excessive force."). As mentioned above, the issue is whether Mr. McCue had a clearly established constitutional right not to experience the particular force to which he was subjected. *Id.*

When assessing whether a right was clearly established, "'the salient question ... is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).[21] Significantly, a First Circuit case with the same or similar facts is not required to provide notice to Defendants of Mr. McCue's rights. *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011) ("Even without a First Circuit case presenting the same set of facts, defendants would have had fair warning that given the circumstances, the force they are alleged to have used was constitutionally excessive.").

Defendants maintain that case law does not clearly establish that "having weight periodically placed on [one's] legs or shoulders for purposes of restraint and control" and having a five-point restraint applied are "per se objectively unreasonable" applications of force. (Motion at 22 – 23.) If the inquiry is as Defendants suggest (i.e., whether the application of force to Mr. McCue's shoulders and the use of a five-point restraint are "per se objectively unreasonable"), Defendants' qualified immunity argument has merit. The methods of force employed have not been declared per se unreasonable. *See*, *e.g.*, *Hill v. Carroll Cnty.*, 587 F.3d 230, 232 – 33, 237 &

---

[21] In opposition to the motion for summary judgment, Plaintiff cites police training materials and expert testimony in an apparent effort to establish the standards and expectations of the industry. The preliminary issue is whether the state of the *law* has been clearly established. While the training and industry standards might be relevant to an assessment of the objective reasonableness of an officer's conduct, the training and expectations of the industry do not govern a court's assessment of whether the *law* was clearly established at the time.

n.1 (5th Cir. 2009) (use of five-point restraint does not constitute excessive force per se); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) (placing subject in prone position and placing weight on back not objectively unreasonable).  The issue, however, is not whether the methods of force employed are "per se objectively unreasonable."  A reasonable method of force can be employed excessively, or employed where it is not warranted.  *See*, *e.g.*, *Tekle v. United States*, 511 F.3d 839, 848 (9th Cir. 2007) ("Although there may not be a prior case specifically prohibiting the use of handcuffs and weapons by more than twenty officers to subdue an unarmed eleven-year-old boy who is not suspected of any wrongdoing and is cooperating with the officers, '[*a*]*ny* reasonable officer should have known that such conduct constituted the use of excessive force.'") (emphasis in original) (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003)).

The issue is whether Defendants were on notice that the force that they allegedly employed was unconstitutional under the circumstances.  First, to the extent that Plaintiff contends that Defendants' use of any particular method of force constitutes a constitutional deprivation, Plaintiff's claim fails.  The law was not clearly established that the techniques and the number of officers involved were excessive under the circumstances of this case, given Mr. McCue's erratic and combative behavior, and given his persistent efforts to resist apprehension and detention.  To the extent that Plaintiff maintains that certain techniques were per se objectionably unreasonable because Plaintiff was in a state of excited delirium, Plaintiff's argument also fails.  Plaintiff has cited no persuasive legal authority to support the contention that the law was clearly established that the use of any particular method of force on a person in the state of excited delirium violates the person's constitutional rights.

Plaintiff's argument, however, is not based exclusively on the nature of the force employed. In support of his excessive force claim, Plaintiff also cites the degree of force used after Mr. McCue allegedly ceased resisting and no longer presented a threat to himself and the officers.  In particular, Plaintiff maintains that the continued use of significant force, particularly on Mr. McCue's upper body, was excessive while Mr. McCue was face down on the pavement after he stopped resisting. At the time of Mr. McCue's apprehension, the law was clearly established that use of a significant level of force after a subject has ceased resisting violates the Fourth Amendment. *Jennings v. Jones*, 499 F.3d 2, 20 – 21 (1st Cir. 2007) ("Jones' use of increased force after Jennings ceased resisting violated the Fourth Amendment, the law was clearly established, and a reasonable officer in Jones' circumstances would have believed that his conduct was a violation.").  *See also Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force.") (citation omitted);  *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.").

Because the right was clearly established at the time of Defendants' encounter with Mr. McCue, the Court must assess "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Ford,* 768 F.3d at 23.  The question is whether Defendants reasonably should have known that Mr. McCue ceased resisting and that the force that they employed after he ceased resisting was excessive.  Whether a suspect may be regarded as effectively subdued is a question of fact.  *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 497 (6th Cir. 2012).  At a minimum, in this case, whether and at what point Mr. McCue was subdued and no longer resisting and the degree of force employed after Mr. McCue ceased

resisting are disputed facts.  In other words, the record, including the video recording of the incident, contains facts, which when viewed most favorably to Plaintiff, could support the conclusion that during the encounter, before he became unconscious, Mr. McCue ceased resisting, that Defendants should have realized that Mr. McCue was no longer resisting and did not pose a danger to himself and the officers, that although Mr. McCue ceased resisting, Defendants continued to exert significant force on him,[22] including force to Mr. McCue's upper body, while he was face down on the pavement, which force was no longer necessary to subdue Mr. McCue or to reduce the threat that he posed to himself or others. [23]  In short, the record contains facts, when viewed most favorably to Plaintiff, that could support the conclusion that reasonable individuals in Defendants' position would have known that they were violating Mr. McCue's constitutional rights.

Because the record includes factual disputes regarding Plaintiff's claim that Defendants used excessive force after Mr. McCue allegedly ceased resisting, Defendants' are not entitled to summary judgment based on qualified immunity on that issue.  To the extent that Plaintiff attempts to rely upon Defendants' conduct before Mr. McCue ceased resisting, Defendants' conduct cannot be construed to violate a clearly established right.  Defendants, therefore, are entitled to summary judgment based on qualified immunity on any such excessive force claims.

---

[22] For instance, although Defendants assert that "Officers Kuhn and Farrar did not continuously have their weight on McCue's shoulders; it was only applied intermittently depending on McCue's level of resistance" (DSMF ¶ 88), the video recording could be viewed differently.

[23] Defendants argue that the officers "did not have their weight on McCue's shoulders continuously; it was only applied intermittently depending on the amount of resistance that he was exhibiting at any given point," and that there is no "clearly established right to be free from having weight periodically placed on … legs and shoulders for purposes of restraint and control." (Motion at 21 – 22.)  Alternatively, Defendants contend:  "Finally, even assuming for the sake of argument that McCue had momentarily stopped all forms of resistance …, it would have been objectively reasonable for the officers to believe that he was only being temporarily compliant and that continued force was necessary to prevent him from resuming his struggle."  (Reply at 14, ECF No. 95.)  Defendants' argument suggests that alternative interpretations of the facts exist as to whether Mr. McCue ceased resisting and the degree of force applied after Mr. McCue arguably ceased resisting.

### 2.    *Reasonable basis for seizure*

Defendants cite multiple reasons to support the decision to take Mr. McCue into custody, including probable cause to believe that he presented a threat to himself or others due to mental illness, and probable cause to believe that he had engaged in misdemeanor criminal behavior in their presence (disorderly conduct, criminal mischief, obstructing a public way, and refusing to submit to arrest or detention).  Plaintiff contends that Mr. McCue had not committed a crime, but effectively concedes that Mr. McCue was exhibiting signs of excited delirium that justified taking him into protective custody.

Presented with Mr. McCue's undisputed behavior, a reasonable officer would have recognized that the apprehension and detention of Mr. McCue were supported by probable cause for the protection of the public and for Mr. McCue's own protection.  *See* 34-B M.R.S. § 3862(1) (empowering officers to take individuals into protective custody based on mental illness presenting a "threat of imminent and substantial harm to that person or to other persons"); *id.* § 3801(5) (defining "mentally ill person" to include someone "suffering effects from the use of drugs"). Plaintiff, therefore, has not asserted any facts that would support a finding that Defendants violated Mr. McCue's rights when they decided to apprehend him.  Even if a constitutional deprivation could be found, the doctrine of qualified immunity precludes Plaintiff's recovery on a claim for false arrest.  While it has long been established that an arrest in the absence of probable cause offends the Fourth Amendment, *Abreu-Guzman v. Ford*, 241 F.3d 69, 73 (1st Cir. 2001) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)), qualified immunity shields an officer from suit "if the presence of probable cause is arguable or subject to legitimate question." *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004).  Mr. McCue's behavior at the very least generated a legitimate question whether he needed to be taken into protective custody.

### 3.    *Deliberate indifference*

State officials violate the Fourteenth Amendment when they exhibit deliberate indifference to a detainee's serious medical needs.  *Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015).  Such a claim requires evidence that will satisfy both an objective standard and a subjective standard.  *Id.*  The objective standard requires proof of a serious medical need, such as a condition that makes it obvious to even a layperson that medical attention is required.  *Id.* at 78 – 79.  The subjective standard requires proof of "wanton disregard," or "purposeful intent" to deny the needed care.  *Id.* at 79.

The record lacks any evidence that would support the conclusion that Defendants acted with "wanton disregard" or "purposeful intent" with respect to a serious medical need.  In particular, the video of the encounter reveals that Defendants noticed Mr. McCue's unresponsiveness soon after his last observed movement and immediately secured appropriate care from emergency medical personnel.  Defendants, therefore, are entitled to summary judgment on Plaintiff's section 1983 claim based on Defendants' alleged deliberate indifference to a serious medical need. [24]

---

[24] In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which opinion was issued after Defendants and Plaintiff submitted their initial briefs, the Supreme Court held that excessive force claims brought by "pretrial detainees" are subject to the objective reasonableness standard, rather than a subjective intent-to-do-harm standard.  *Id.* at 2472 – 73. The decision generates the question as to whether an objective reasonableness standard should also apply to a detainee's claim based on a denial of necessary medical assistance, rather than the subjective deliberate indifference standard.  To the extent *Kingsley* can be interpreted to modify the legal standard in favor of Plaintiff's claim, however, that standard was not clearly established on September 12, 2012.  Moreover, even under an objective reasonableness standard, Defendants would be entitled to qualified immunity.  Viewing the evidence most favorably to Plaintiff, Defendants promptly identified Mr. McCue's need for resuscitative care (i.e., within a very short time after Mr. McCue became unconscious), and took appropriate steps to facilitate that care (i.e., notifying nearby emergency medical personnel and summoning an ambulance).  Under the circumstances, a reasonable law enforcement officer would not have understood that he or she was violating Mr. McCue's constitutional rights regarding Mr. McCue's need for medical care.  As for the City of Bangor, the municipal liability claim would fail for the reasons explained below.

### 4.      *Municipal liability*

Municipalities are deemed "persons" for purposes of section 1983. Although the doctrine of *respondeat superior* does not apply to municipalities, such that they are not vicariously liable under section 1983 for the misconduct of their employees, a municipality has liability for constitutional deprivations if it is the moving force behind the deprivation. That is, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* To generate liability, the failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360.

As explained above, the sole basis upon which liability could be imposed on the individual Defendants is the alleged excessive force used to restrain Mr. McCue after he ceased resisting. To prevail against Defendant City of Bangor, therefore, Plaintiff would at a minimum have to establish that the City's decision-makers were aware that the City's training was deficient and that the deficiencies were causing a violation of individuals' constitutional rights.

The record is devoid of any evidence that could reasonably be construed as deliberate indifference. More specifically, the record contains no facts upon which one could reasonably

conclude that the city's policy-makers were aware that the city's police officers lacked appropriate training in the use of force after an arrestee stopped resisting, and that with that knowledge, the policy-makers failed to act appropriately.  Defendant City of Bangor is thus entitled to summary judgment on Plaintiff's section 1983 claim.

## B.  State Law Claims

Plaintiff's complaint includes four state law tort claims:  assault and battery (count II), a "respondeat superior and vicarious liability" claim against the City of Bangor (count IV), wrongful death (count VII),[25] and negligent/intentional infliction of emotional distress (count VIII).

Defendants request the entry of summary judgment on the state law tort claims based on the immunity provisions of the Maine Tort Claims Act (MTCA).  (Motion at 33.)  Defendants essentially argue that if they are entitled to qualified immunity on the section 1983 claims, they can be presumed to have immunity under the MTCA.  (*Id.*)  On this record, Plaintiff's assault claim is partially within the protection of the immunity afforded by the MTCA.

Under the MTCA, the employees of state governmental entities have personal immunity against tort claims when the claims are based on "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused," provided the act "is reasonably encompassed by the duties of the governmental employee."  14 M.R.S. § 8111(1)(C).  "A law enforcement official's use of force is a discretionary act."  *Comfort v. Town of Pittsfield,* 924 F. Supp. 1219, 1236 (D. Me. 1996).  Consequently, "[d]iscretionary immunity applies unless the defendants' conduct 'clearly exceeded, as a matter of law, the *scope* of any discretion [they]

---

[25] While Plaintiff asserts a separate count for wrongful death (Count VII), Maine's wrongful death statute, 18–A M.R.S. § 2–804, does not establish a separate theory of liability.  The statute authorizes a cause of action "[w]henever the death of a person shall be caused by a wrongful act, neglect or default [that] would, if death had not ensued, have entitled the party injured to maintain an action and recover damages …"  18–A  M.R.S. § 2–804(a).  I construe Plaintiff's claim for assault and battery to be the alleged "wrongful act, neglect or default" contemplated by the wrongful death statute.  Count VII, therefore, does not assert a separate cause of action.

could have possessed in [their] official capacity as [police officers].'" *Lyons v City of Lewiston*, 666 A.2d 95, 101 (Me. 1995) (quoting *Polley v. Atwell,* 581 A.2d 410, 414 (Me.1990) (emphasis in original)).

The decision to apply force to seize Mr. McCue was within the scope of Defendants' discretion because probable cause supported the seizure. *Creamer v. Sceviour*, 652 A.2d 110, 115 (Me. 1995); *Blackstone v. Quirino*, 309 F. Supp. 2d 117, 130 (D. Me. 2004). For similar reasons, Defendants are entitled to immunity under the MTCA on Plaintiff's tort claim that is based on Defendants' alleged use of excessive force before Mr. McCue ceased resisting Defendants' efforts to detain him. The use of excessive force, however, exceeds the scope of a law enforcement officer's discretion. *Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281, 292. Accordingly, because the record includes a genuine issue of material fact as to whether Defendants used excessive force after Mr. McCue ceased resisting and was no longer a danger to himself or others, Defendants are not entitled to summary judgment on Plaintiff's state law tort claim that is based on the same conduct.

## CONCLUSION

Based on the foregoing analysis, the recommendation is that the Court grant in part and deny in part Defendants' Motion for Summary Judgment (ECF No. 83). In particular, I recommend the following:

1. That the Court enter judgment in favor of the City of Bangor on the entirety of Plaintiff's § 1983 civil rights claim.

2. With respect to the individual Defendants:

   a. That the Court enter judgment in favor of Defendants on Plaintiff's civil rights claim that is based on (i) Plaintiff's assertion that Defendants

lacked probable cause to seize Mr. McCue, and (ii) Plaintiff's assertion that Defendants acted with deliberate indifference toward Mr. McCue's need for medical care.

b. That on Plaintiff's civil rights excessive force claim, the Court grant the motion for summary judgment in favor of Defendants except as to Plaintiff's claim that the individual Defendants used excessive force after Mr. McCue ceased resisting their efforts to apprehend and detain him. [26]

c. That based on a qualified immunity determination and a corresponding immunity determination under the MTCA, on Defendants' request for summary judgment on the state law assault claim, the Court enter judgment in favor of Defendants except as to Plaintiff's assault claim based on Defendants' alleged use of excessive force after Mr. McCue ceased resisting Defendants' efforts to apprehend and detain him. To the extent that Defendants' motion is construed to request summary judgment on any of the other state law tort claims, I recommend that the Court deny the motion. [27]

---

[26] Defendants have not argued that some individual officers are better situated than others with respect to their arguments for summary judgment.  Accordingly, this Recommended Decision does not distinguish among the individual Defendants on Plaintiff's claims.

[27] Consistent with the Court's scheduling orders (ECF Nos. 32, 45, and 63) and the parties' agreement to address the qualified immunity issue before engaging in more extensive discovery, the focus of the discovery to this point and the basis of Defendants' summary judgment motion is the defense of qualified immunity.  This Recommended Decision, therefore, does not address any other possible bases for summary judgment on the state law tort claims, including whether Defendant City of Bangor is afforded any further protection under the MTCA, or whether Plaintiff can proceed on an independent claim for emotional distress damages in this action.

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 22nd day of September, 2015.